

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-20-00225-CV

_____

STEVEN HERNANDEZ, FRANCISCO AZUERO, AND FAMILY HERITAGE
LIFE INSURANCE COMPANY OF AMERICA, Appellants

V.

COMBINED INSURANCE COMPANY OF AMERICA, Appellee

On Appeal from the 67th District Court
Tarrant County, Texas
Trial Court No. 067-316824-20

Before Sudderth, C.J.; Bassel and Wallach, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

This is an interlocutory appeal in which Appellants Steven Hernandez, Francisco Azuero, and Family Heritage Life Insurance Company of America[1] challenge a temporary-injunction order entered at the request of Appellee Combined Insurance Company of America.

Individual Appellants are former district sales managers of Combined who terminated their employment with Combined and became affiliated with Family Heritage. Combined sued Appellants alleging various causes of action based on the claim that Individual Appellants had violated covenants in their employment agreements. Combined sought a temporary injunction to restrain Appellants from soliciting Combined's employees and policyholders and from using its confidential information. After a lengthy hearing, the trial court entered an order granting a temporary injunction (hereinafter the injunction order). Individual Appellants and Family Heritage perfected an appeal and filed separate briefs.

In nine issues, Individual Appellants launch a multifront attack on the injunction order. Individual Appellants' challenges to the injunction order fall into two categories. The first category asserts that the trial court abused its discretion because the record

---

[1]Throughout the opinion, we use the term Individual Appellants to refer to Hernandez and Azuero collectively and the term Appellants to refer to all three Appellants—Hernandez, Azuero, and Heritage.

does not support Combined's right to injunctive relief. Relying on the generous standard of review that applies to temporary-injunction appeals, we conclude that the trial court did not abuse its discretion. Specifically, the trial court acted within its discretion to find that Combined had a probable right to recovery based on preliminary determinations that the covenants were reasonable, that Individual Appellants had committed acts in violation of the covenants, and that Combined would likely experience an imminent and irreparable injury if the temporary injunction were not entered.

The second category of challenges involves the form of the injunction order and Individual Appellants' claims that the order does not describe its restraints in reasonable detail, restrains lawful activity, and grants relief beyond that requested by Combined. Because we sustain many of these challenges, we remand this case to the trial court to address the deficiencies that we identify in the order.

Family Heritage raises two issues. We hold that the trial court abused its discretion by restraining Family Heritage because the evidence does not support a finding that Family Heritage interfered with Combined's contractual relations with Individual Appellants and that Family Heritage is not vicariously liable for Individual Appellants' acts. Because Family Heritage should not have been enjoined, we vacate the portion of the injunction order restraining Family Heritage, dissolve the temporary injunction as to Family Heritage, and do not reach its second issue that challenges the form of the injunction order.

## II. Factual and Procedural Background

### A. Factual background

Individual Appellants started as sales agents at Combined and rose through the ranks to become district managers who supervised scores of agents on their respective sales teams. Their teams sold supplemental insurance policies and operated in Combined's Division 48 that marketed policies to a Spanish-speaking demographic.

When Individual Appellants began working at Combined, they signed employment agreements, and the covenants contained in those contracts underlie Combined's claims against them. The covenants contained in Individual Appellants' respective contracts are identical. In paragraph (19)(a) of the agreements, Individual Appellants affirmed that, for a period of two years after termination of the agreements, they would not

> (i) solicit or attempt to solicit on behalf of another insurer, any insurance of the kind or character sold by the Company (including but not limited to, accident & health, Medicare Supplement[,] and life insurance) to any of the Company's policyholders in the Sales Territory covered by this Agreement, or (ii) induce, or attempt to induce, any of the Company's policyholders to cancel, lapse, or fail to renew their polic[i]es with the Company in said Sales Territory.

The agreements also provided that, for two years after the termination of the agreements, Individual Appellants would not

> in any way directly or indirectly induce or attempt to induce any of the Combined Companies' directors, officers, sales representatives, agents[,] or other employees working in the state(s) in which the Employee's Sales Territory is located[] to terminate their employment with the Combined Companies[] or to sell insurance for any other company.

4

The covenant defined "Sales Territory" as that territory or territories in which Individual Appellants had been assigned to work. Though there was controversy at trial about the extent of the respective sales territories, in general terms, Hernandez's territory encompassed counties in the Dallas–Fort Worth metropolitan area, and Azuero's territory encompassed an area around Miami, Florida.

The agreements also noted that Individual Appellants would come into possession of confidential information. In the agreements, Individual Appellants promised not to disclose that information.

Combined presented evidence that Hernandez had been given or had access to a wide range of confidential information about Combined's operations in his roles as a sales agent and later as a district manager. Combined also presented evidence that Azuero had access to information about all the Combined policyholders in Florida where his sales territory was located. Hernandez acknowledged that he had received some confidential information, but he disputed both the type of information that he had received and whether he had ever actually accessed the information that Combined claimed that he could access. Combined acknowledged that it did not have direct evidence that Hernandez had retained confidential information when he had left Combined but claimed that he had unusually high usage of the information in the months before his departure.

5

Apparently, the impetus for Individual Appellants' departure from Combined came in late 2019. Azuero left Combined first, resigning in January 2020. Within a week of Azuero's resignation, he became affiliated with the other Appellant in this matter, Family Heritage. Hernandez left approximately one month later, in February 2020, and testified that his concerns about staying with Combined arose because its policies created a high turnover of agents and because other changes jeopardized his income.

One of Combined's claims focused on whether Individual Appellants had violated the covenants in their employment agreements by actions that occurred (1) after Azuero had become affiliated with Family Heritage and (2) at a February 18, 2020 meeting where Hernandez announced to his Combined sales team that he was resigning. Individual Appellants gave innocent explanations about what had occurred, while Combined portrayed the events as raising an inference that Individual Appellants had induced Combined's sales agents to leave Combined and to become affiliated with Family Heritage.

For example, Hernandez acknowledged that, before the February 18 meeting, he flew to Miami to meet with Azuero and another former agent of Combined who had moved to Family Heritage—Reineldo Urgelles. Hernandez acknowledged that the purpose of this meeting was for him to obtain more information about Family Heritage.

Combined argued that the Miami meeting was apparently a session to prepare for Hernandez's efforts to induce his sales team to follow him to Family Heritage. For

6

example, Combined highlighted that after the Miami meeting, Azuero sent Hernandez a document to be given to Combined agents before they signed a contract to become affiliated with Family Heritage. The document stated that "they were never contacted or persuaded by [Family Heritage's] Regional Director, **Francisco Azuero**, to quit their employment at Combined" and that they had made their employment decisions "voluntarily and without any coercion." Hernandez testified that the document was prepared out of fear of possible "sanctions" from Combined and that its purpose was to document that Combined's agents had not been solicited by Individual Appellants to join Family Heritage.

The differing portrayals of events and motives carried forward as the parties described the events leading to and occurring at the February 18 meeting when Hernandez announced his resignation from Combined. As background, Hernandez called weekly meetings of his Combined sales team to discuss sales goals and to welcome new team members. But the February 18 meeting was apparently the first one that was not held at Combined's offices. One person who attended testified that she had understood that it would be a standard marketing meeting; instead, Hernandez announced his resignation from Combined but did not say that he was moving to Family Heritage. Another attendee testified that Hernandez stated during the meeting that he was moving to Family Heritage.

Also, Azuero and Urgelles appeared at the meeting. Individual Appellants explained Azuero and Urgelles's presence as coincidental, claiming that they had come

7

to Texas to discuss another line of insurance that they and Hernandez sold, and said that the meeting was not held at Combined's office because they met at the location of the broker for the other line of insurance. Though there was a photo of Azuero and Urgelles at the front of the room where the meeting with Hernandez's team occurred, Hernandez testified that during the meeting, he and Azuero did nothing to induce his sales team to join Family Heritage. Azuero claimed that he did not know who the attendees at the meeting worked for and could not remember whether he had mentioned Family Heritage while at the meeting. Yet Hernandez acknowledged, after his deposition testimony was read back to him, that he had told the attendees that Azuero and Urgelles had come to answer questions arising out of Hernandez's resignation.

There were other divergences in the testimony about what had occurred at the February 18 meeting. Individual Appellants' description of the sequence of events at the meeting was that Hernandez announced his resignation, and then he, Azuero, and Urgelles left the meeting. They went back to Hernandez's cubicle to discuss the other line of insurance. According to Individual Appellants, several members of Hernandez's sales team came of their own accord to the cubicle and asked questions about Hernandez's plans. Individual Appellants stated that they merely answered the questions from those who wanted to know more about Family Heritage or had concerns.

But two members of Hernandez's sales team who remained with Combined after his departure and who had attended the meeting portrayed what had occurred differently. They testified that, during the meeting, Hernandez and Azuero spoke of both the problems that Combined was experiencing and the advantages that Family Heritage offered its representatives. And Hernandez acknowledged that, at the meeting, he had discussed the benefits of working for Family Heritage.

What several of Hernandez's team members did after the meeting was not controverted. A number of the attendees signed the form that Azuero had sent Hernandez that stated they were not contacted by or persuaded to seek employment from Family Heritage. Of the twenty-five to thirty members of Hernandez's sales team who attended the meeting, eighteen signed the form. Ten to thirteen of those who signed the form subsequently became affiliated with Family Heritage.

Further, Hernandez did not tell Combined of his resignation until after the February 18 meeting. When a representative of Combined met with Hernandez to discuss his resignation, he did not disclose that he planned to become affiliated with Family Heritage. But Hernandez signed a marketing agreement with Family Heritage the day after his resignation.

After Hernandez's departure from Combined, Individual Appellants communicated about conducting interviews of Combined's agents, and the text messages about those interviews, according to Combined, included a picture of Hernandez and the agents. Combined offered testimony that, after the interviews, the

9

agents ended their affiliation with Combined and became affiliated with Family Heritage. Combined acknowledged that it did not know if these agents had reached out about joining Family Heritage. Hernandez testified that those who were interviewed had already submitted applications to become affiliated with Family Heritage before they were interviewed. But of the sixty agents who were listed as former agents of Combined and later became affiliated with Hernandez at Family Heritage, thirty-six had been on Hernandez's team at Combined.

As with the divergent portrayals of whether agents of Combined were induced by affiliates of Family Heritage to leave, the same divergence occurred with the parties' portrayals of whether Individual Appellants had solicited Combined's policyholders. Other than one policyholder whose actions were highly disputed, Combined offered no evidence that policyholders to whom Hernandez had sold a Combined policy had cancelled that policy, and there was strong disagreement about the actions of the one former Combined policyholder who had purchased a policy from Family Heritage. Instead, Combined offered proof that hundreds of Combined policyholders had called in to cancel policies that had been sold to them by former members of Hernandez's Combined sales team who had moved to Family Heritage. Combined acknowledged that it did not know if any of those policyholders had moved to Family Heritage. However, Combined's representative testified that the fact that the policyholders had called in to cancel indicated that they had a replacement policy. Also, Combined introduced text messages in which Azuero had sent Hernandez a form for policyholders

10

to disclaim that they had been solicited to cancel a policy with Combined.  Hernandez had responded to Azuero when he received the document, "You think that'll work?"

Family Heritage disclaimed any responsibility for Individual Appellants' actions primarily because the representative agreement that they had signed with Family Heritage stated that they were independent contractors.  Family Heritage also contended that it did not exercise control over how its representatives did business or how its representatives recruited members for their sales teams.  In response, Combined argued that though the marketing agreements characterized Family Heritage's representatives as independent contractors, they also contained provisions by which Family Heritage exerted control over how the representatives conducted business such that the representatives were actually its agents rather than independent contractors.

Family Heritage also disclaimed knowledge of the covenants contained in Individual Appellants' employment agreements with Combined and of the events of the February 18 meeting, and it claimed that it had learned of the agreements and events when it was copied on a cease-and-desist letter sent by Combined.  After receiving the letter, Family Heritage claimed that it had undertaken an investigation of the letter's allegations that Individual Appellants had engaged in acts that solicited or induced Combined's agents and policyholders.  Family Heritage claimed that the investigation concluded that the February 18 meeting was for the purposes that Individual Appellants had described though Combined challenged its results.  Family Heritage did put in place a hold on the acceptance of new nominations of former Combined agents as its

11

representatives. But no matter what the result of Family Heritage's investigation or the actions that it had taken, Combined argued that Family Heritage had turned a blind eye to Individual Appellants' misdeeds and was improperly benefitting from their misdeeds by profiting from the acts of the agents allegedly lured from Combined to Family Heritage.

## B.     Procedural background

Combined sued Hernandez and Family Heritage, alleging tortious interference and conspiracy and requesting a constructive trust. Combined also asserted breach-of-contract and breach-of-fiduciary-duty claims against only Hernandez. The trial court entered a temporary restraining order that Combined sought in the original petition.

Combined later amended its petition to add Azuero as a party alleging claims against him for tortious interference and conspiracy and requesting a constructive trust. But the amended petition did not seek a temporary restraining order against Azuero. Rather, the amended petition requested a temporary injunction against all Appellants.

The trial court conducted a two-day hearing on Zoom on Combined's request for a temporary injunction. The trial court entered an injunction order, which the court subsequently amended. The injunction order included a number of findings that we will reference as we address the parties' arguments. Based on the findings, the injunction order imposed the following restraints:

> IT IS, THEREFORE, ORDERED that [Appellants] be enjoined, directly or indirectly, whether alone or in concert with others, including any

12

partner, agent, servant, employee, employer, independent contractor, and/or representative . . . from[]

a. Inducing or attempting to induce any of Combined's directors, officers, sales representatives, agents[,] or other employees who worked in Texas or Florida to terminate their employments with Combined;

b. Inducing or attempting to induce any of Combined's directors, officers, sales representatives, agents[,] or other employees who worked in Texas or Florida to sell supplemental life, accident[,] and health insurance products for any other company;

c. Soliciting or attempting to solicit on behalf of another insurer, any insurance of the kind or character sold by Combined (including but not limited to accident & health, Medicare Supplement[,] and life insurance) or inducing or attempting to induce any of Combined's policyholders within [Individual Appellants'] sales territories to cancel, lapse[,] or fail to renew their policies with Combined;

d. Divulging, disclosing[,] or using Combined's confidential information as it is defined in the Combined standard employment agreement, including the identities, skills, talents, knowledge, experience, compensation, and preferences of any Combined Division 48 employees in Texas or Florida;

e. Destroying, hiding, deleting, or altering any document or electronically stored information relevant, or which could lead to the discovery of relevant information, to the subject matter of this lawsuit.

Appellants then perfected this appeal. Individual Appellants and Family Heritage filed separate briefs challenging the injunction order.

## III. Standards Governing Temporary Injunctions and Standard of Review

"A temporary injunction is an extraordinary remedy and does not issue as a matter of right." *Abbott v. Anti-Defamation League Austin, Sw., & Texoma Regions*, 610 S.W.3d 911, 916 (Tex. 2020) (quoting *Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex. 1993)).

13

Such an injunction functions "to preserve the status quo of the litigation's subject matter pending a trial on the merits." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002) (op. on reh'g) (citing *Walling*, 863 S.W.2d at 57). "To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim." *Id.*

The trial court exercises its sound discretion in deciding whether to issue a temporary injunction, and we may reverse that decision only if we conclude that the trial court abused its discretion because its actions were "so arbitrary that [they] exceeded the bounds of reasonable discretion." *Id.* Our abuse-of-discretion review requires that we "view the evidence in the light most favorable to the trial court's order [and that we indulge] every reasonable inference in its favor." *IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 196 (Tex. App.—Fort Worth 2005, no pet.). Thus, if the trial court must resolve a conflict in the evidence, its resolution of a fact issue is one to which we must defer. *Wright v. Sport Supply Grp., Inc.*, 137 S.W.3d 289, 292 (Tex. App.—Beaumont 2004, no pet.). However, we review the trial court's application of the law to established facts and the resolution of pure legal questions de novo. *Jelinis, LLC v. Hiran*, 557 S.W.3d 159, 165 (Tex. App.—Houston [14th Dist.] 2018, pet. denied), *cert. denied*, 140 S. Ct. 244 (2019); *Tom James of Dall., Inc. v. Cobb*, 109 S.W.3d 877, 883 (Tex. App.—Dallas 2003, no pet.). Also, "[w]hen the trial court embeds findings of fact and conclusions of law in its order denying a temporary injunction, the findings and

14

conclusions may be helpful in determining whether the trial court exercised its discretion in a principled fashion[;] however, they are not binding on this court." *Communicon, Ltd. v. Guy Brown Fire & Safety, Inc.*, No. 02-17-00330-CV, 2018 WL 1414837, at \*6 (Tex. App.—Fort Worth Mar. 22, 2018, no pet.) (mem. op.).

Because the temporary injunction only preserves the status quo pending final trial, the trial court's determination regarding whether to issue the temporary injunction does not resolve the ultimate merits of the suit. *Brooks v. Expo Chem. Co.*, 576 S.W.2d 369, 370 (Tex. 1979). The assumption is that the evidence may well change between the preliminary temporary-injunction stage of the proceeding and a final trial on the merits. *Burgess v. Denton Cty.*, 359 S.W.3d 351, 359 n.35 (Tex. App.—Fort Worth 2012, no pet.) (citing *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978)). Thus, the probability-of-success requirement does not require an applicant to show that it will prevail at final trial. *Kim v. Oh*, No. 05-19-00947-CV, 2020 WL 2315854, at \*2 (Tex. App.—Dallas May 11, 2020, no pet.) (mem. op.). The requirement goes no further than necessitating that "the applicant [] present enough evidence to raise a *bona fide* issue as to its right to ultimate relief." *Id.*

## IV. Analysis

**A.** **The trial court did not abuse its discretion when it made a preliminary determination that the covenants at issue were reasonable in their restraints and that Combined had a probable right to recovery.**

In their sixth issue, Individual Appellants assert that the trial court abused its discretion by issuing the injunction order because the covenants that Combined sought to enforce were unreasonable in their restraints and, for this reason, Combined could not establish a reasonable likelihood of success on its claims that would support a probable right to recovery. We turn to this issue first because its resolution would accord Individual Appellants the greatest relief in that sustaining the argument would undermine the entire basis of Combined's right to an injunction. Individual Appellants' primary challenge is that the covenants unreasonably restrict which employees and policyholders Individual Appellants could deal with after they left Combined's employment. We reject this contention. We review the reasonableness question from the perspective of whether the trial court had evidence to support its finding that Combined had a probable right to relief and not from the perspective of a final decision on the merits that the covenants were reasonable. Applying this standard, we conclude that the trial court did not abuse its discretion when it made a finding that the covenants were reasonable as part of its probable-right-to-relief determination. We also reject Individual Appellants' subsidiary arguments that appear to be predicated on narrow evidentiary challenges that we reject or deal with in other sections of this opinion.

**1. In reviewing the issuance of a temporary injunction dealing with a covenant not to compete, the trial court makes a preliminary determination regarding whether the covenant is reasonable.**

In addressing the arguments about the reasonableness of the covenants, we first set forth the limited scope of our review. The preliminary question of reasonableness requires application of the standards of enforceability for covenants found in Section 15.50 of the Business and Commerce Code:

> [A] covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

Tex. Bus. & Com. Code Ann. § 15.50(a).

As we noted when describing the standard of review, the ultimate merits of a suit are not before the trial court when deciding whether to issue a temporary injunction. Thus, when we review the propriety of a temporary injunction, we do not resolve the ultimate question of whether a covenant is legally enforceable under the provisions of Texas Business and Commerce Code Section 15.50, which governs those covenants. *See Henry F. Coffeen III Mgmt., Inc. v. Musgrave*, No. 02-16-00070-CV, 2016 WL 6277375, at *2 (Tex. App.—Fort Worth Oct. 27, 2016, no pet.) (mem. op.).

Rather, in the context of a temporary injunction involving a noncompete covenant, we review the enforceability issue "only to the extent necessary to determine whether the requirements for a temporary injunction have been met." *Tranter, Inc. v.*

17

*Liss*, No. 02-13-00167-CV, 2014 WL 1257278, at *3 (Tex. App.—Fort Worth Mar. 27, 2014, no pet.) (mem. op.); *see also Vaughn v. Intrepid Directional Drilling Specialists, Ltd.*, 288 S.W.3d 931, 938 (Tex. App.—Eastland 2009, no pet.) ("[B]y granting a temporary injunction, a trial court does not declare that a covenant not to compete is valid."); *EMSL Analytical, Inc. v. Younker*, 154 S.W.3d 693, 695 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (stating that an appeal of an order granting or denying a temporary injunction based on a noncompete covenant does not present for appellate review the ultimate question of whether the covenant is enforceable under the Covenant Not to Compete Act); *Tom James of Dallas*, 109 S.W.3d at 882–83.

For a noncompete covenant to be enforceable under Section 15.50 of the Texas Business and Commerce Code, it must be, among other things, reasonable. Tex. Bus. & Com. Code Ann. § 15.50(a). Though neither we nor the trial court pass on the ultimate enforceability of the covenant, we must still ensure that the covenant is at least arguably reasonable under the applicable provisions of the Business and Commerce Code in order to decide whether the injunction applicant has shown a likelihood of success on the merits of its claims.[2] The Fourteenth Court of Appeals has explained why even though the trial court may not reach the ultimate question of whether the

---

[2]In addition to reasonableness, enforceability under Section 15.50 also requires a noncompete covenant to be "ancillary to or part of an otherwise enforceable agreement at the time the agreement is made." Tex. Bus. & Com. Code Ann. § 15.50(a). Individual Appellants do not argue that the covenants fail because they are not ancillary to an enforceable agreement.

covenant is reasonable and thus enforceable, it must still make a preliminary assessment of the covenant's compliance with the governing statute when deciding whether to issue a temporary injunction:

> [J]ust because [S]ection 15.50 does not control the analysis in interlocutory orders does not mean it plays no role in that analysis. . . . [T]o be entitled to a temporary injunction, an applicant must establish, among other things, a probability of ultimate success on the merits. This requirement protects opposing parties from the inherent interference of temporary injunctions when it appears unlikely that the applicant ultimately will prevail in the lawsuit. As appellants recognize, [S]ection 15.50(b) will play a pivotal and possibly dispositional role in the final outcome of appellants' cause of action for breach of the noncompete covenant. Accordingly, in order to properly assess appellants' likelihood of success on the merits, the trial court was required to consider the potential application of [S]ection 15.50(b) under the circumstances presented.

*LasikPlus of Tex., P.C. v. Mattioli*, 418 S.W.3d 210, 216 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (citations omitted).

Also, although Section 15.50 does not define what constitutes a covenant not to compete, the statute applies to the covenants at issue. As noted by the Dallas Court of Appeals, "[T]he supreme court holds that a covenant restricting former employees from soliciting their 'former employers' customers *and employees'* is a restraint of trade subject to § 15.50." *See Smith v. Nerium Int'l, LLC*, No. 05-18-00617-CV, 2019 WL 3543583, at *4 (Tex. App.—Dallas Aug. 5, 2019, no pet.) (mem. op.) (citing *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 768 (Tex. 2011) (op. on reh'g), and *Exxon Mobil Corp. v. Drennan*, 452 S.W.3d 319, 327 (Tex. 2014)).

In this appeal, Combined challenges whether Section 15.50 governs nonsolicitation covenants and describes the *Smith v. Nerium* decision quoted in the preceding paragraph as dicta. We disagree. The following rationale from the Corpus Christi–Edinburg Court of Appeals explains that nonsolicitation agreements

> are subject to the same analysis as covenants not to compete. *See Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 600 (Tex. App.—Amarillo 1995, no writ) (stating that "other than the moniker assigned it, nothing truly differentiates the [nonsolicitation] promise at bar from a covenant not to compete"). The purpose and effect of a non[]solicitation agreement parallel those inherent in a non[]compete covenant. *Id.* at 599. Both contain geographic and durational parameters, and both effectively restrict competition. *Id.* at 599–600; *see* Tex. Bus. & Com. Code Ann. § 15.[50](a). A non[]solicitation agreement is sufficiently analogous to a covenant not to compete such that the provisions of the Act must apply fully to such agreements. *See* Tex. Bus. & Com. Code Ann. § 15.50(a).

*Shoreline Gas, Inc. v. McGaughey*, No. 13-07-364-CV, 2008 WL 1747624, at \*10 (Tex. App.—Corpus Christi–Edinburg Apr. 17, 2008, no pet.) (mem. op.). We find this rationale persuasive and hold that Section 15.50 governs the noncompete agreements in this case.

> **2.    The trial court did not abuse its discretion by making a preliminary finding that the covenants reasonably restrained Individual Appellants from inducing Combined's agents to terminate their employment or to sell competing insurance.**

Individual Appellants initially challenge the restrictions found in paragraph (19)(b) of their contracts that prohibit them from inducing or attempting to induce "Combined Companies' directors, officers, sales representatives, agents[,] or other employees working in the state(s) in which the Employee's Sales Territory is located"

to terminate their employment with Combined or to sell competing insurance. Individual Appellants argue that the restraints in this paragraph are unreasonable because they encompass employees of Combined whom they have never met or whom they are unaware are employed by Combined or employees who went to work for Combined after Individual Appellants' departures.

The trial court did not abuse its discretion by rejecting Individual Appellants' challenge to the scope of this restriction when deciding whether it would issue a temporary injunction. To support this conclusion, we rely on a recent decision from the Dallas Court of Appeals that dealt with and rejected a challenge similar to the one raised by Individual Appellants: *Smith v. Nerium Int'l, LLC*. *See* 2019 WL 3543583, at *5–6.

*Smith* dealt with a covenant restricting high-ranking members of Nerium's sales force from soliciting and recruiting other members of the force to join companies that engaged in the same type of marketing as Nerium. *Id.* at *1. Our sister court held that the covenant protected a legitimate business interest of the company because it protected the goodwill that the company had developed through its sales force and because there was also evidence that the former salespersons had access to confidential information, such as the sales performance of those who were downstream of them in the sales-force hierarchy. *Id. Smith* specifically addressed the question of whether the covenant was so overbroad and unreasonable that the trial court abused its discretion by issuing a temporary injunction based on it. *Id.* at *6–8. The salespersons challenging

21

the reasonableness of the nonsolicitation covenant in *Smith* relied on the same case that Individual Appellants cite as support for their argument—our opinion in *Ally Financial, Inc. v. Gutierrez*, No. 02-13-00108-CV, 2014 WL 261038 (Tex. App.—Fort Worth Jan. 23, 2014, no pet.) (mem. op.). *See id.* at *7. In *Ally*, we concluded that a covenant that prevented a member of a company's IT department from soliciting any of its employees for two years after leaving the company was unreasonable. 2014 WL 261038, at *2–4. The covenant was unreasonable because it went beyond what was necessary to protect the company's goodwill and other business interests. *Id.* at *8.

The Dallas court in *Smith* concluded that *Ally* did not support the argument that Nerium's covenant was unreasonable, even though Nerium's covenant prohibited the solicitation of employees who the salespersons did not know or who had joined the company after the salespersons had ended their affiliation with the company. 2019 WL 3543583, at *7–8. *Smith* concluded that the covenant protected the company's interests because the former salespersons "had access to the Nerium back office and could thereby learn which [sales force members] in their downlines were the most successful and the most desirable to recruit even if appellants did not personally know the [sales force members]." *Id.* at *8. Also, because of their positions at Nerium, the salespersons had a cachet that gave them enhanced credibility. *Id.* The covenant was reasonable to prevent the salespersons from recruiting other members of the sales force who worked at the company when they did. *Id.* Further, the company had a legitimate interest in

22

preventing the departed salesperson from recruiting members of the sales force who

had joined the company after their departures. *See id.* As *Smith* explained,

> The trial court could also reasonably conclude that Nerium has a legitimate interest in restraining appellants from recruiting [sales personnel] who joined after appellants [had] cut their ties with Nerium. Because these new [members of the sales force] would acquire Nerium's confidential information and make use of its goodwill as soon as they joined the company, the trial court could reasonably decide that Nerium has a legitimate interest in restraining appellants from recruiting them.

*Id.*[3]

---

[3]*Smith* also noted federal authority that concluded that a broad-ranging covenant, such as the one in this case, was reasonable. 2019 WL 3543583, at *7. *Smith* cited to *Everett Fin., Inc. v. Primary Residential Mortg., Inc.*, No. 3:14-CV-1028-D, 2016 WL 7378937 (N.D. Tex. Dec. 20, 2016) (mem. op. & order). The court in *Everett* discussed why it had concluded that a broad-ranging nonsolicitation covenant, imposed by a company known as Supreme, was reasonable as follows:

> The Branch Managers reply that a restraint on soliciting all Supreme employees is still too broad to be reasonable; that a reasonable covenant would be limited to only those employees with whom the Branch Managers had contact at Supreme, leaving the Branch Managers free to solicit other Supreme employees; that employee solicitation covenants are governed by the same reasonableness standard as client solicitation covenants, *see Marsh*, 354 S.W.3d at 768; and that client solicitation covenants must be limited to clients with whom the employees had personal contact, *see Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 388 (Tex. 1991). The Branch Managers therefore maintain that a restraint against soliciting all Supreme employees, including those with whom they never had contact, is unreasonable.
>
> The Branch Managers have not identified an authority holding that it is unreasonable to restrain solicitation of all current employees at a company of Supreme's size. And it is not clear that the Supreme Court of Texas would extend its reasonableness analysis of client solicitation covenants to operate identically with respect to employee solicitation covenants. For example, although the Branch Managers rely on *Haass*, in that case the client solicitation restriction at issue would have required the

23

We reject Individual Appellants' application of *Ally* to this appeal for reasons similar to those cited by *Smith* for rejecting *Ally*'s application to its facts. Combined's corporate representative testified that as soon as Hernandez signed his employment agreement, he was given confidential information dealing with "market strategy product information, business information, strategic information, [and] how we go to business." Hernandez's access to confidential information on customers and employees increased as he was promoted. The corporate representative described the information that Hernandez had access to as a district manager as follows:

> Q. (BY [COMBINED'S ATTORNEY]) . . . [W]hat sort of information was provided to Mr. Hernandez by Combined when he was a district manager?
>
> A. Certainly, as generally stated as a district manager, he would have [a] tremendous amount of confidential information, specifically around our customer's demographic information, names, addresses, types of coverages, dates of birth, in some cases, Social Security numbers, [which] we protect very, very highly at Combined Insurance.

---

departing partner to "in effect, take a prospective client's accounting history" to determine if the client had been served by his previous firm. . . . 818 S.W.2d at 387 (internal quotation marks omitted). By contrast, in this case, the restriction only applies to soliciting *current* Supreme employees. This court has previously held that an employee non[]solicitation covenant extending to all current employees is a reasonable protection of the employer's interest in maintaining its employees. *Merritt Hawkins*[*Assocs., LLC v. Gresham*], 79 F. Supp. 3d [625,] 639–40 [(N.D. Tex. 2015) (order)] (upholding covenant against soliciting all employees). The court therefore holds that the Non[]Solicitation Agreement is not invalid for lack of a geographical or similar limitation.

*Id.* at *8.

And he would also have had access to fellow employee[s'] information at the entire division, agents, where they worked, their names, their addresses, phone numbers, all of the contact information, types of insurance that we sold.

I believe he would have seen that for [] every single agent as a manager at Division 48, along with the customers -- customers would have been a little more restrictive of what we would have seen for [the] [S]tate of Texas.

Q. The information that Mr. Hernandez had access to related to the agents within Division 48. Would that information include their sales records?

A. For all agents in the [S]tate of Texas, he could have, yes.

Q. And that would include information about how much they sold and what their commission was?

A. Yes. He would have seen the premium that they sold and the commission could be figured out, yes.

Q. And would he be able to determine from that information which agents were the best performers or the highest producers at Combined?

A. Certainly. There was also information around that . . . [that] we sent. As a district manager, [he would have had access to] all of the e-mails that come up from our corporate office or our regional offices[,] [including] how [much] producers [are] producing. So if he wanted to get that, he could receive that on an immediate basis.

But . . . in a sales organization, it's [a] very competitive . . . environment[;] it's about winning. So we push a lot about performance.

Also, Hernandez had contact with sales managers outside his team through Combined's national and regional meetings. Because of his status, he also had the opportunity to meet "all the top producers and [the] most successful people within the

25

organization." The last event that Hernandez attended before departing from Combined gave him access to the company's 400 top "elite [managers] and agents."

As in *Smith*, Hernandez had access to sales and production information for all the agents in Texas. He also had the opportunity to develop contacts with the top producers in the company.[4] Apparently, Hernandez's sales generated through his sales team also gave him a special status within the company. At this preliminary stage of the proceeding, we conclude that the trial court acted within its discretion to find that Combined met the threshold of raising a bona fide issue that the noncompete covenant was reasonable to protect Combined from Individual Appellants' use of the knowledge that they had acquired while with Combined. Therefore, the trial court did not abuse its discretion by restraining Individual Appellants from "induc[ing] or attempt[ing] to induce any of the Combined Companies' directors, officers, sales representatives, agents[,] or other employees working in the state(s) in which [their] Sales Territory is located" to terminate their employment with Combined or to sell insurance for another company.

---

[4]The evidence about what access Azuero had to confidential information is more limited. Combined's corporate representative described Azuero as having the same access to policyholder information as Hernandez did. Azuero also had been a Combined district manager and presumably had similar access to the same information that Hernandez did in that role. Further, Azuero makes no argument that even if the injunction were proper as to Hernandez, it is improper as to him because the proof of Hernandez's access to confidential information was stronger.

**3.** **The trial court did not abuse its discretion by making a preliminary finding that the covenants reasonably restrained Individual Appellants from soliciting Combined's policyholders to purchase insurance from a competitor.**

Individual Appellants also challenge paragraph (19)(a) of their contracts that restricts them from soliciting Combined's policyholders—as opposed to Combined's agents—in Individual Appellants' former sales territories to purchase insurance competitive to that sold by Combined or to induce those policyholders to cancel their policies. Individual Appellants' argument is that the nonsolicitation covenant is unreasonable because it restricts them from soliciting customers with whom they never had any dealings.

Again, a covenant restricting the solicitation of a former employer's clients may be reasonable when it is necessary to protect an employer from the disclosure of confidential information. The Dallas Court of Appeals recently explained the application of this principle as follows:

> Covenants not to compete prohibiting solicitation of clients with whom a former salesman had no dealings are unreasonable and unenforceable. *Haass*, 818 S.W.2d at 386–88. . . . In *Haass*, the Texas Supreme Court held [that] a restriction that prevented an employee from soliciting any of the employer's customers worldwide, including those with whom he had no dealings during his employment, was unreasonable because it was not reasonably necessary to protect the employer's business interest of preventing the employee from taking his clients with him to a competitor. *Id.* at 387–88. However, when an employer seeks to protect its confidential business information in addition to its customer relations, broad non[]solicitation restrictions are reasonable. *See Accruent, LLC v. Short*, No. 1:17-CV-858-RP, 2018 WL 297614, at *6 (W.D. Tex. Jan. 4, 2018) [(order)] (applying Texas law). In *Short*, the court held [that] a provision preventing an employee from soliciting customers with whom

27

he had no personal involvement was reasonable because the employer's business interests included not only the employee's client base but also the employee's knowledge of proprietary information, which he might use to help a competitor. *Id.* And in *M-I LLC v. Stelly*, the court held [that] a similar restraint was reasonable because the employer's business interests involved not only preserving its client base but also maintaining sensitive business information provided to an upper management employee. 733 F. Supp. 2d 759, 798–800 (S.D. Tex. 2010) [(mem. & order)] (applying Texas law).

*Gehrke v. Merritt Hawkins & Assocs., LLC*, No. 05-18-01160-CV, 2020 WL 400175, at *4 (Tex. App.—Dallas Jan. 23, 2020, pet. denied) (mem. op.).

Again, at this preliminary stage of the proceedings, the ultimate question of the enforceability of the covenant prohibiting the solicitation of policyholders was not before the trial court and is not before us. But at this preliminary stage, Individual Appellants' access to confidential information about Combined's customers meets the threshold of raising a bona fide issue regarding whether Combined may be able to enforce the covenant, and the trial court did not abuse its discretion by finding that Combined had a probable right of recovery to enforce the covenant.

### 4. The subsidiary arguments that Individual Appellants raise do not show an abuse of discretion by the trial court.

Individual Appellants next argue that the covenants are unreasonable because there is no evidence that they had access to company-wide confidential information or accessed information for policyholders whom they or the agents on their teams did not sell to. Individual Appellants also claim that they had no contact with non-English speaking agents or policyholders. The testimony from Combined's corporate

28

representative, quoted above, shows that Individual Appellants had broader access to information than they acknowledge in their argument. And their claim that they did not access the information that was available to them is not an attack on the reasonableness of the covenant but an attack on the evidentiary support for the injunction. We will deal with that issue shortly.

Individual Appellants also purport to challenge the reasonableness of the geographical reach of the covenants. Again, the covenant restricts them from soliciting customers in their "sales territory." Individual Appellants' attack is not that such a provision is unreasonable based on the confidential information provided to them or the need to protect the goodwill of Combined but that there was a controversy at trial about what constituted their sales territories, and the injunction should have clarified whose definition of "sales territory" it had adopted. This argument is an attack on the form of the injunction and is not a legal argument about the reasonableness of the covenant. We will address the question about the form of the injunction in a later portion of this opinion.

Next, in a single paragraph, Individual Appellants attack the reasonableness of the covenant's provision that restricts them from soliciting agents in the entirety of the states in which their sales territories were located. They argue again that the covenant is unreasonable because it includes employees that they had never met in areas that they had never visited. Once again, the testimony from Combined's corporate representative that we have quoted above indicates that Individual Appellants had

access to confidential information about agents throughout the states in their territories. At this preliminary point in the proceeding, the trial court did not abuse its discretion by restricting Individual Appellants from soliciting agents based on the argument they had never met or dealt with those agents.

We overrule Individual Appellants' sixth issue.

## B. The trial court did not abuse its discretion by finding that Individual Appellants had solicited Combined's policyholders and agents.

In their seventh issue, Individual Appellants launch attacks on the following findings in the injunction order:

13. Combined has established a probable right of relief that [Individual Appellants] have *solicited* Combined's policy[]holders within their territories as there was an unusually large amount of cancellations of policies written by [Individual Appellants] and their teams following their resignations.

14. Combined has established a probable right of relief that [Individual Appellants] have breached their confidentiality restrictions by, among other things, using or disclosing Combined agents' contact information and *soliciting* the best[-]performing agent[s] on their teams. [Emphasis added.]

Individual Appellants contend that they did not violate their covenants because the definitions of the words used in the covenants—"inducing" and "soliciting"—mean more than simply answering questions brought to them by agents and policyholders about taking actions that they were already contemplating. The crux of the argument is that Individual Appellants did not persuade anyone to leave Combined but merely responded to inquiries by those who had decided on their own to inquire about making

a change. In essence, Individual Appellants argue that the trial court made unreasonable inferences from the evidence that it had heard. We agree that the evidence of solicitation and inducement offered at the injunction hearing was hardly overwhelming. But again, we apply a standard that requires us to view the evidence in the light most favorable to the trial court's order and to indulge every reasonable inference in its favor. *See IAC*, 160 S.W.3d at 196. Applying that standard, we reject Individual Appellants' evidentiary attacks for the reasons set forth below.

**1.    The trial court did not abuse its discretion by making a preliminary finding that Individual Appellants solicited Combined policyholders.**

Individual Appellants first contend that there is no evidence to support an inference that they solicited any Combined policyholders. We agree with Individual Appellants that the definitions of the words "inducing" and "soliciting" embrace more than merely answering questions brought by others. Indeed, a recent opinion by our court defines "solicit" to require behavior more motivational than answering questions. *See Nguyen v. ABLe Commc'ns, Inc.*, No. 02-19-00069-CV, 2020 WL 2071757, at *12 (Tex. App.—Fort Worth Apr. 30, 2020, no pet.) (mem. op.) (quoting *Eurecat US, Inc. v. Marklund*, 527 S.W.3d 367, 381 (Tex. App.—Houston [14th Dist.] 2017, no pet.), and recognizing that, "[i]n the context of employer–employee relations, the commonly understood meaning of 'solicit' is 'to "make petition to[,]" . . . ; "to approach with a request or a plea[,]" . . . ; "to move to action"; . . . [or] "to endeavor to obtain by asking or pleading."'"). And inducement requires more than purely passive involvement.

31

*Inducement*, Black's Law Dictionary (11th ed. 2019) ("The act or process of enticing or persuading another person to take a certain course of action.").

Individual Appellants highlight that Combined offered no testimony from any policyholders stating that they had been solicited. Individual Appellants also dispute that any inference can be drawn from Combined's evidence that, in the months following their departure, there were hundreds of cancellations by policyholders who had been sold Combined policies by former Combined agents who were now working on Hernandez's team at Family Heritage. Individual Appellants try to downplay the effect of this testimony with two arguments.

First, they claim that the testimony regarding mass policy cancellations has no purpose because it failed to tie the cancellations to policies held by Individual Appellants' clients rather than to policies held by the members of their teams. In their words, "[i]t would defy logic for [Individual] Appellants to unlawfully solicit their team members' clients—but *none* of their own." However, Combined's representative testified that the agents whose policyholders had cancelled were now working under Hernandez at Family Heritage.[5] Also, Combined's representative testified that, as a

_____

[5]When asked which policyholders he was asking the court to enjoin Hernandez from soliciting, Combined's representative testified as follows:

> We have a high level of unusual cancellation[s,] [and] we're in the process of doing some discovery with those customers. But we need to determine why a large number of hundreds of customers of agents that are now working under Mr. Hernandez have left us.

32

manager, Hernandez "did not have a lot of personal sales." Thus, the simple fact that it was not Hernandez's personal clients who were cancelling does not undermine an inference at this preliminary stage of the proceeding that he was orchestrating the cancellations through his team members who were previously Combined agents and who were now with Family Heritage.

Second, Individual Appellants attack the trial court's ability to draw an inference from Combined's representative's testimony because it did not sufficiently explain why the level of cancellations was unusual or rebut the possibility that the cancellations were the result of policyholders being unable to pay premiums in hard economic times. This argument criticizes the trial court for not drawing the inferences that Individual Appellants advocated. But disagreement with the inferences does not mean that they are unreasonable. Further, the challenged inferences are not so unsupported by the evidence as Individual Appellants claim them to be.

Combined did quantify that there were hundreds of cancellations and that this was an unusual amount for the period of time involved. Combined's representative also testified that when policyholders called to cancel, that usually meant that they had a replacement policy—a fact that allowed the trial court to infer that the cancellations were for reasons other than the fact that the policyholders could no longer afford their policies.

Individual Appellants also simply ignore conduct on their part that suggests preparation to solicit Combined's policyholders, lending support to the trial court's

33

inference. Azuero sent Hernandez a draft document for each policyholder to sign saying that the decision to cancel the policy was the policyholder's own choice and that the policyholder had not been told to cancel the policy. When Azuero sent Hernandez the draft of this document, Hernandez had asked, "You think that'll work?" At this preliminary stage of the proceeding, the document, taken together with Individual Appellants' conduct in handling the document, is at least some evidence of Individual Appellants' preparation to solicit Combined's policyholders and attempt to cover the tracks of that effort.

### 2. The trial court did not abuse its discretion by making a preliminary finding that Individual Appellants had solicited Combined agents.

Individual Appellants take a similar approach in attacking the evidence that they had induced employees to leave as they take in attacking the evidence of solicitation of Combined's policyholders. That is, Individual Appellants claim that there is no direct evidence that they induced any agent to leave Combined, and they testified that they had not done so. Again, their view of the evidence is an effort to ignore reasonable inferences drawn from the evidence and the broad discretion that the trial court holds in drawing those inferences when dealing with the request for a temporary injunction.

Individual Appellants first attack what inferences can reasonably be drawn from the events of the February 18 meeting. Individual Appellants offer their innocent

explanations for the presence of Family Heritage agents at the meeting and for what was discussed during and after the meeting.[6]

Perhaps it was a happy coincidence that Azuero and another Family Heritage agent, Urgelles, were at the meeting. The evidence, however, allowed the trial court to infer that their presence was part of an effort to present Hernandez's team members with reasons why they should follow him to Family Heritage at the instant he disclosed his resignation from Combined.

There was evidence of laying the groundwork for such a plan. A week prior to the February 18 meeting, Hernandez flew to Miami to meet with both Azuero and Urgelles to discuss joining Family Heritage. The day of the meeting, Azuero sent Hernandez a document for the Combined agents to sign disclaiming that they had been solicited by Azuero or Urgelles. Hernandez acknowledged that Azuero had advised

---

[6]Individual Appellants couch their argument as follows:

The trial court found that [] Individual Appellants [had] solicited Combined's agents to come work for Family Heritage during the February 18, 2020 meeting. The uncontroverted evidence shows otherwise. Combined's own witnesses testified that[] (1) Family Heritage was not mentioned during the meeting; (2) Hernandez did not introduce Azuero or Urgelles during the meeting; (3) nobody told Combined's agents to stop working for Combined; (4) nobody gave out any information on how to join Family Heritage, and not a single agent indicated that they planned to join Family Heritage; and (5) no one offered Combined's agents a job with Family Heritage or even invited them to apply with Family Heritage. [Record references omitted.]

him to have Combined's agents sign the statement before they were given contracts to become affiliated with Family Heritage.

With this groundwork in place, Azuero and Urgelles flew to the Dallas–Fort Worth area to be present at the very meeting where Hernandez announced his resignation. Hernandez claims that he ended the meeting and then met with Urgelles and Azuero to discuss other matters and that, during that time, they were approached by agents who had attended the meeting and had questions about Family Heritage. No one disputes the result that ten to thirteen of the agents involved in the allegedly impromptu post-meeting discussion resigned from Combined and went to work with Family Heritage.

Also, agents who had attended the meeting countered Individual Appellants' portrayal of what had occurred. An agent who was at the meeting noted the unusual circumstances of the meeting. Prior meetings that Hernandez had called with his team had occurred at Combined's offices. The February 18 meeting was called by Hernandez at a location other than Combined's offices. When Hernandez announced the meeting to his team, it appeared to be for the same purpose as prior meetings—namely, to welcome new team members and discuss goals. But at the February 18 meeting, Hernandez resigned. And Azuero and Urgelles arrived and gave a presentation at the moment the meeting ended. In fact, one Combined agent who testified at the hearing stated that she thought that it was unethical that Azuero and Urgelles had arrived at the meeting precisely when Hernandez announced his resignation. When Azuero and

36

Urgelles appeared, they mentioned Family Heritage and discussed how people who had coverage with Family Heritage could save money. Apparently, Azuero also mentioned that he had just left Combined. The Combined agent who offered this testimony did not hear a discussion of the benefits of working at Family Heritage; but she left the meeting before everyone else, and she stated that she later learned that agents had switched their employment.

Another agent present at the meeting testified as to what had occurred as follows:

[O]nce [Hernandez] presented or announced that he was resigning, he mentioned, ["]If you want to know where I'm going, I'm going to this company, which is Family Heritage.["]

And following that, he started presenting the benefits that -- or advantages that may -- that opportunity may present to us. And at the same time, he started talking about all the things that were wrong with Combined, and then he presented the proposal for us to consider whether or not we wanted to follow him.

. . . .

Once he announced his reassignment and mentioned . . . where he was going, he proceeded to present certain individuals and introduce them to us from the Family Heritage company.

Later, the witness testified that "[Hernandez said] [t]hat he had been traveling to Miami several times to meet with some former Combined agents, which were those individuals present there, and that he very much liked their product and their compensation package and that he [would be going to] work for them." The witness acknowledged that Hernandez did not try to convince him to leave Combined. Also,

37

the witness did not hear Hernandez try to convince anyone else to leave Combined, but the witness left the meeting while others remained.

The evidence cataloged above casts doubt on Individual Appellants' innocent portrayal of the February 18 meeting. They avoid the evidence that it was a preplanned effort to gather Hernandez's sales team, let them know of his resignation, and have Urgelles and Azuero there to discuss the advantages of working for Family Heritage. The document that agents signed to show that they had not been solicited does not insulate Individual Appellants from the inferences that can be drawn from these suspicious circumstances. Indeed, the fact that the document was prepared ahead of the meeting is at least some evidence that (1) Individual Appellants had planned to invite Hernandez's sales team to join Family Heritage, and (2) the document stating that the agents were not solicited was a subterfuge. And, again, the result of what occurred is not challenged—some of Combined's agents who had been on Hernandez's sales team did leave to join Family Heritage.

Individual Appellants try to blunt the effect of the evidence by pointing us to the definition of "solicit" in *Nguyen* that requires a move to action. *See* 2020 WL 2071757, at *12. But it was within the trial court's discretion to find that the strategy of the February 18 meeting was to move the members of Hernandez's sales team to the action of joining Family Heritage. The person who led their group gathered them together without fully disclosing his purpose, he announced his resignation, and he explained that his resignation was prompted by the problems that he saw at Combined, he

38

presented Family Heritage as having advantages over Combined, and then he suggested that the agents consider whether they should do the same—i.e., resign and join Family Heritage. As subtle as they perhaps were, the efforts could be understood as designed to convince the agents to move and were much more than passively answering questions.

And, apparently, the efforts continued after the February 18 meeting as text messages indicated that Azuero was conducting interviews of Combined's agents in the weeks that followed. Combined's corporate representative testified that, after February, another agent had "called our director, our current director, and told him that he had been recruited -- solicited by [Hernandez]. He was now going to work for Family Heritage." This agent had apparently not been part of Hernandez's team at Combined.

There was other testimony about the results of Individual Appellants' efforts as well. Fifty percent of Hernandez's new team at Family Heritage was comprised of former Combined agents, to the tune of thirty-three people. Hernandez benefitted from the agents that he recruited to join him at Family Heritage because he received a percentage of their sales commissions.

We have outlined the evidence before the trial court that supports an inference that Individual Appellants prepared and implemented a plan to induce agents of Combined to move to Family Heritage. Their preplanning began by preparing documents to disclaim that they had solicited agents; the document preparation arguably suggests that they were planning to cover their tracks. Their behavior at the

February 18 meeting and the portrayal by Combined's witnesses of what occurred at that meeting are sufficient for the trial court to doubt Individual Appellants' claim that they only passively answered questions raised by team members. And the trial court also drew inferences of inducement from Individual Appellants' post-meeting interviews, especially when a Combined agent who had left to join Family Heritage reported that he had been solicited. Under the standards by which we review the trial court's actions, we conclude that the trial court did not abuse its discretion by finding that Individual Appellants had induced or had attempted to induce Combined's employees to terminate their employment or to sell insurance for another company.

We overrule Individual Appellants' seventh issue.

### C. The trial court did not abuse its discretion by finding that Individual Appellants had breached the contractual restriction on their use of Combined's confidential information.

In their eighth issue, Individual Appellants challenge the trial court's finding that "Combined has established a probable right of relief that [Individual Appellants] have breached their confidentiality restrictions by, among other things, using or disclosing Combined['s] agents' contact information and soliciting the best[-]performing agent[s] on their teams." Again, the attack is based on a disagreement with the inferences that the trial court drew from the evidence or arguments that we have already rejected. We will briefly address these in turn.

- Individual Appellants contend that there is no evidence that they solicited agents. We have considered and rejected that argument.

40

- Individual Appellants argue that there is no evidence to support the characterization of the recruited agents as being the "best performing." It is true that Combined's representative did not use the term "best performers" when describing agents who had formerly worked for Hernandez at Combined but who now work under him at Family Heritage. But when the corporate representative listed the agents who had followed Hernandez, the representative described several of the agents as having been "very successful." Individual Appellants' argument is thus an attack on semantics and not on whether an inference could be drawn that Hernandez was using information he had acquired while at Combined to determine which agents to recruit for his team at Family Heritage.

- Individual Appellants also rely on the testimony that they had not kept the iPads issued to them by Combined and that Combined's representative offered no direct evidence that Hernandez had downloaded information from the device before resigning from Combined. This argument ignores the full extent of the testimony in the very portion of the record they cite. Specifically, Combined's representative testified that Hernandez had an unusually high level of access to information that dealt with the performance of agents before his departure:

  > I don't have any direct insight into as far as I didn't sit next to Mr. Hernandez as he might have taken that information.

41

What I do have is usage reports from our database that Mr. Hernandez utilize[d] some of our data information [in] unusually high [amounts] in January and December or more than he did before.

So looking at, you know, agents['] information and bonuses, all that information, so we're able to tell what he was looking at. I can't tell you if that information was downloaded somehow.

This evidence, in combination with Hernandez's actions and the fact that his new team seems to be composed of successful former Combined agents, was sufficient to allow the trial court to draw a reasonable inference that Hernandez had the motive and the opportunity to obtain Combined's confidential information and that he had put that information to use.

We overrule Individual Appellants' eighth issue.

**D.** **The trial court did not abuse its discretion by finding that Combined would probably suffer an imminent and irreparable injury if an injunction were not issued.**

**1.** **The trial court did not abuse its discretion by finding that the probable injury was imminent.**

In their ninth issue, Individual Appellants attack the trial court's determination that Combined will probably suffer an imminent injury if an injunction order were not entered because Combined failed to establish any imminent danger of that injury. In essence, Individual Appellants' argument is that "imminence" requires proof that the acts allegedly causing the threatened injury are actually occurring, and "an injunction is not proper [because the threat of injury is not imminent] when the claimed injury is merely speculative; fear and apprehension of injury are not sufficient to support an

injunction." *See Livingston v. Livingston*, 537 S.W.3d 578, 595–96 (Tex. App.—Houston [1st Dist.] 2017, no pet.). We reject Individual Appellants' assertion that an injury is not "imminent" for purposes of injunctive relief.

Individual Appellants' argument that Combined's injury is too speculative to support the trial court's injunction focuses on the trial court's findings that

> [u]nless [Appellants] and those acting in concert with them[] are immediately restrained, Combined will suffer irreparable injury if [Appellants] are allowed to benefit from the breach of Hernandez's employment agreement with Combined or are allowed to interfere with the non[]solicitation agreements of Combined's agents or to disclose or otherwise profit from any of Combined's confidential information and trade secrets.

Repeating the bases for their prior attacks regarding solicitation and confidential information, Individual Appellants challenge the proof that they have solicited Combined's agents or policyholders or utilized its trade secrets—with the primary emphasis in their argument being a lack of evidence that establishes a direct tie between their actions and Combined's loss of policyholders. We will not repeat our analysis from Sections B and C, *supra*, stating the inferences that the trial court was capable of drawing to support its findings on those issues.

Further, there was a rebuttable presumption that the probability of an injury was more than speculative. That presumption provides that "[a] highly trained employee's continued breach of a noncompete agreement creates a rebuttable presumption that the employer is suffering an irreparable injury." *See Tranter*, 2014 WL 1257278, at *7. Here, there is sufficient evidence that Hernandez formed his team by soliciting agents from

43

his team at Combined. Individual Appellants are undoubtedly in direct competition with Combined in the same market and for the same products that they sold while at Combined. We have cataloged the testimony from Combined's representative regarding the information that Individual Appellants had access to and how they could use such information in their new endeavor.

Individual Appellants claim that they were merely salesmen for Combined and not the type of highly trained personnel that the presumption applies to. But it was within the trial court's ambit at this stage to decide how highly trained they were. The trial court heard about how they had risen through the ranks at Combined and about the level of information that they had access to. Further, the fact that a person is a "salesman" is not a bar to the application of the presumption if the salesman has acquired the training and information that qualify him as highly trained. *See id.* at \*1, \*7–9 (applying presumption to regional sales manager); *Wright*, 137 S.W.3d at 292 (applying presumption to former salesman); *Unitel Corp. v. Decker*, 731 S.W.2d 636, 641 (Tex. App.—Houston [14th Dist.] 1987, no writ) (applying presumption to former sales personnel); *Martin v. Linen Sys. for Hosps., Inc.*, 671 S.W.2d 706, 709 (Tex. App.— Houston [1st Dist.] 1984, no writ) (applying presumption to salesperson who solicited accounts for prior employer and had access to employer's customer list and pricing information); *Hartwell's Office World, Inc. v. Systex Corp.*, 598 S.W.2d 636, 639 (Tex. App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.) (op. on reh'g) (applying presumption to former top salesman).

44

Also, the argument that Combined cannot provide direct evidence tying Individual Appellants' actions to a loss of policyholders is a variant of an argument that we rejected in a parallel case. Specifically, in *Tranter, Inc. v. Liss*, we rejected Individual Appellants' argument and applied the presumption even in the absence of direct evidence of the use of confidential information by the former employee because of the inevitability that the former employee would use confidential information under those circumstances. *See* 2014 WL 1257278, at *8. We rejected their argument because "[r]ather than rebutting the presumption, this evidence demonstrates precisely why the presumption exists," namely, because "the former employee working in a similar capacity can hardly prevent his knowledge of his former employer's confidential methods from showing up in his work." *Id.* (citing *Daily Instruments Corp. v. Heidt*, 998 F. Supp. 2d 553, 569 (S.D. Tex. 2014)); *Williams v. Compressor Eng'g Corp.*, 704 S.W.2d 469, 472 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.)).

Both in the present case and in *Tranter*, the core fact remained that the defendant employee was in direct competition with his former employer in the territory that he had worked in, and he was competing for similar customers. *See Tranter*, 2014 WL 1257278, at *9. "While there was evidence that [the former employee] was not actively trying to use [the former employer's] confidential information, there was no evidence rebutting the presumption that [the former employee] would have extreme difficulty in not indirectly applying some of that confidential knowledge in his position at [new employer]." *Id.* (citing *Rugen v. Interactive Bus. Sys., Inc.*, 864 S.W.2d 548, 552 (Tex. App.—

45

Dallas 1993, no writ), *Hartwell's Office World*, 598 S.W.2d at 63, and *Daily Instruments Corp.*, 998 F. Supp. 2d at 569).

Here, Individual Appellants similarly fail to explain how they can go into competition in the same market with the same product sold by Combined and not use the information that they had acquired while at Combined. Again, at this stage of the proceeding, the trial court's determination that Combined would probably suffer an imminent injury was within its discretion.

### 2. The trial court did not abuse its discretion by finding that the probable injury would be irreparable.

In another argument under their ninth issue, Individual Appellants challenge the trial court's finding that Combined would suffer an irreparable injury; they argue that Combined could be compensated monetarily for any injuries caused by their actions. Individual Appellants do not quote the extensive findings that the trial court made on the issue of irreparability.[7] Instead, they argue that Combined could cite only to the

---

[7]The primary findings are as follows:

16. Accordingly, the Court finds that unless a Temporary Injunction is entered immediately enjoining [Appellants] and anyone acting in concert with them from using or disclosing Combined's confidential information and trade secrets, violating Hernandez's non[]solicitation and non[]disclosure requirements, and tortiously interfering with Combined['s] agents' non[]solicitation agreements, there is imminent danger that Combined will suffer immediate and irreparable harm, loss, and damage in the form of lost profits, loss of market share, loss of goodwill, and a decrease in business directly resulting from the acts of Hernandez and Family Heritage. Combined has no adequate remedy at law, due to the continuing nature of the damages and the extreme

46

loss of ten employees as a result of Individual Appellants' actions at the February 18

meeting and claim that any damage from that loss was quantifiable. Further, they argue

that Combined could not establish a loss of goodwill from the departure of the ten

agents in light of how many other agents had left Combined recently.

But Combined's representative testified to several types of irreparable injuries

resulting from Individual Appellants' actions:

> Yes. Obviously, I've already mentioned -- testified to the fact that we are losing policyholders by the hundreds based on the agents that are now working at Family Heritage, previous coverage.
>
> Obviously, these are agents that we invest a lot of time, effort, and we trained them. A lot of the people that are now working [for] Family Heritage, when they started working for Combined, it's their first time working for insurance. So we spent a lot of time and a lot of effort, a lot

difficulty inherent in attempting to quantify the damages in monetary terms.

17. The Court finds that the irreparable injury that Combined seeks to avoid by obtaining equitable relief arises from the very nature of Combined's confidential information and trade secrets, which it seeks to protect and recover. If Combined's confidential information and trade secrets are not protected from improper and unauthorized use, their value will be completely destroyed and rendered useless. It is difficult, if not impossible, to assign a dollar value to the loss of business and/or customers that Combined will surely suffer if [Appellants] are permitted to (a) disclose or use any of Combined's confidential information and trade secrets, or (b) continue to solicit Combined's employees or clients. It is also difficult, if not impossible, to assign a dollar value to the damage to Combined's goodwill, business reputation, and relationship with Combined's employees if [Appellants] are not immediately enjoined from violating their agreements and/or soliciting and/or attempting to solicit Combined's employees. Once confidential and secret information is revealed it cannot be recalled.

of investment developing and grooming them. Some moved into management roles.

Obviously, not only that, but, you know, the reputation and the brand of the organization. With[in] [the] supplemental insurance industry, small industry, when we see, you know, that these actions are taking place, this actually damages the reputation of our organization as well as the branding, and that's something that, you know, you can't really put figures into.

But it takes a long, long time to recover from something like that. So it's very irreparable[,] and you can't even see the damage that's going to come because of these actions.

This evidence supports the trial court's findings that Combined will likely suffer an irreparable injury.

The cases that Individual Appellants cite do not persuade us to the contrary. For example, they cite cases establishing that an injury is not considered irreparable if a party can be compensated monetarily, that monetary compensation is usually sufficient unless the loss is considered "legally 'unique' or irreplaceable," and that an injury for breach of contract is usually compensable through a monetary award. *See Cheniere Energy, Inc. v. Parallax Enters. LLC*, 585 S.W.3d 70, 76–77 (Tex. App.—Houston [14th Dist.] 2019, pet. dism'd) (op. on en banc reconsideration); *Lifeguard Benefit Servs., Inc. v. Direct Med. Network Sols., Inc.*, 308 S.W.3d 102, 113 (Tex. App.—Fort Worth 2010, no pet.). These citations ignore the opinions from our court and sister courts highlighting the difficulty in calculating damages in the context of the breach of noncompete covenants and describing the use of confidential information in such cases as "the epitome of irreparable injury." *See Tranter*, 2014 WL 1257278, at *9 (quoting *Daily Instruments Corp.*,

48

998 F. Supp. 2d at 569); *see also, e.g.*, *Equine Sports Med. & Surgery Weatherford Div., PLLC v. Tipton*, No. 02-19-00346-CV, 2020 WL 6165414, at *6 (Tex. App.—Fort Worth Oct. 22, 2020, no pet.) (mem. op.) ("Damages attributable to a former employee's competition and appropriation of goodwill can be difficult to calculate."); *Thomas v. A\*Med Mgmt., Inc.*, No. 01-19-00564-CV, 2020 WL 5269412, at *5 (Tex. App.— Houston [1st Dist.] Sept. 3, 2020, no pet.) (mem. op.) (cataloging cases holding that the damages for loss of customer goodwill and the use of confidential information by a former employee may be difficult to quantify and constitute an irreparable injury); *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 228 (Tex. App.—Fort Worth 2009, pet. denied) ("[A]ssigning a dollar amount to such intangibles as a company's loss of clientele, goodwill, marketing techniques, and office stability, among others, is not easy.").

Individual Appellants' arguments are not without basis, and as with most of their arguments, they might have given the trial court grounds to deny Combined's temporary-injunction request. But applying the standard of review that we have cited repeatedly, the evidence is not so weak that we may conclude that the trial court abused its discretion by finding that Combined would probably suffer irreparable injury.

We overrule Individual Appellants' ninth issue.

49

**E.     The injunction order fails in several regards to describe, in reasonable detail, the acts that it restrains.**

We next turn to Individual Appellants' first through third issues that attack the form of the injunction order by claiming that it does not identify the policyholders and employees of Combined that are the subject of the injunction and fails to describe the confidential information the Individual Appellants are restrained from disclosing. We agree that the injunction order has many of the failings that the Individual Appellants identify.

The injunction order's primary operative terms prohibit the following acts:

a. Inducing or attempting to induce any of Combined's directors, officers, sales representatives, agents[,] or other employees who worked in Texas or Florida to terminate their employments with Combined;

b. Inducing or attempting to induce any of Combined's directors, officers, sales representatives, agents[,] or other employees who worked in Texas or Florida to sell supplemental life, accident[,] and health insurance products for any other company; [and]

c. Soliciting or attempting to solicit on behalf of another insurer, any insurance of the kind or character sold by Combined (including but not limited to accident & health, Medicare Supplement and life insurance) or inducing or attempting to induce any of Combined's policyholders within [Individual Appellants'] sales territories to cancel, lapse[,] or fail to renew their policies with Combined[.]

With respect to their first argument, Individual Appellants contend that these provisions fail to provide the means to identify the "directors, officers, sales representatives, agents[,] or other employees" or the policyholders that fall within the ambit of the injunction order. They also attack the provision because there was

50

disagreement at the injunction hearing about what constituted their sales territories, and the injunction order gives no guidance on whose view of the territories' extent the trial court adopted. We conclude that Individual Appellants' arguments are valid and that the injunction order is flawed because it lacks reasonable detail describing who Individual Appellants may not contact and where they may or may not solicit policyholders.

Texas Rule of Civil Procedure 683 governs the form of an injunction. Tex. R. Civ. P. 683. The rule dictates that an injunction order "shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained." *Id.* "An injunction must be definite, clear, and concise, leaving the person enjoined in no doubt about his duties, and should not be such as would call on him for interpretations, inferences, or conclusions." *Vaughn v. Drennon*, 202 S.W.3d 308, 316 (Tex. App.—Tyler 2006, no pet.) (citing *Gulf Oil Corp. v. Walton*, 317 S.W.2d 260, 264 (Tex. App.—El Paso 1958, no writ) (per curiam)).

We recently noted both the mandatory nature of Rule 683's requirements and the consequences of the failure to adhere to those requirements:

> Rule 683's requirements are mandatory and must be strictly followed. *Qwest Commc'ns Corp. v. AT & T Corp.*, 24 S.W.3d 334, 337 (Tex. 2000); *Big D Props., Inc. v. Foster*, 2 S.W.3d 21, 22–23 (Tex. App.—Fort Worth 1999, no [pet.]). A trial court abuses its discretion when it issues a temporary injunction that does not conform to Rule 683. *IAC, Ltd. . . . ,* 160 S.W.3d [at] 201 . . . ; *Armstrong–Bledsoe v. Smith*, No. 2-03-323-CV, 2004 WL 362293, at *2 (Tex. App.—Fort Worth Feb. 26, 2004, no pet.) (mem. op.) (citing *EOG Res., Inc. v. Gutierrez*, 75 S.W.3d 50, 53 (Tex. App.—San Antonio 2002, no pet.)). Where a temporary injunction does not meet

Rule 683's requirements[,] it is subject to being declared void and dissolved. *Qwest Comm'ns*, 24 S.W.3d at 337; *Big D Props.*, 2 S.W.3d at 22–23.

*SISU Energy, LLC v. Hartman*, No. 02-19-00436-CV, 2020 WL 4006725, at \*14 (Tex. App.—Fort Worth July 16, 2020, no pet.) (mem. op.).

A recurring source of confusion is how an injunction order that prohibits a party from contacting or dealing with a class of persons should identify the persons who fall within the class; this issue frequently arises in cases enforcing a noncompete clause that prohibits a party from dealing with its former employer's customers. Texas caselaw is mixed on this issue, varying based on the court of appeals authoring the opinion and the enjoined party's knowledge of the confidential class members it is prohibited from contacting.

In some cases, the courts have held that the injunction order need not specifically identify the customers. These cases seem to have two rationales. First, if the trade secret protected is a customer list, it would defeat the purposes of confidentiality to identify the customer's names in the injunction order. *See Safeguard Bus. Sys., Inc. v. Schaffer*, 822 S.W.2d 640, 644 (Tex. App.—Dallas 1991, no writ) ("Where secret customer information was one of the main assets sought to be protected, the trial court would defeat that purpose by requiring the public disclosure of such information."); *see also Thomas*, 2020 WL 5269412, at \*6 (citing *Safeguard* for quoted proposition); *Orbison v. Ma-Tex Rope Co.*, 553 S.W.3d 17, 33 (Tex. App.—Texarkana 2018, pet. denied) (same); *Lockhart v. McCurley*, No. 10-09-00240-CV, 2010 WL 966029, at \*4 (Tex. App.—Waco

52

Mar. 10, 2010, no pet.) (mem. op.) (same). Second, courts often conclude that the enjoined party has the knowledge and the necessary information to determine who cannot be contacted because the enjoined party is familiar with his or her former employer's business. *See Safeguard*, 822 S.W.2d at 644; *Lockhart*, 2010 WL 966029, at *4. We employed this rationale in *Bellefeuille v. Equine Sports Med. & Surgery, Weatherford Div., PLLC*, No. 02-15-00268-CV, 2016 WL 1163364, at *7 (Tex. App.—Fort Worth Mar. 24, 2016, no pet.) (mem. op.) (citing *Safeguard* when discussing terms of injunction order). And oftentimes this rule is reasonable because the injunction order is limited to customers with whom the former employee dealt, and this experience provides the knowledge as to who should not be contacted. *See Lockhart*, 2010 WL 966029, at *2 (stating that injunction order prohibited former employee from soliciting clients that he had served, had dealt with, or had represented while employed with his prior employer).

But other cases conclude that an injunction order that does not specifically identify the persons who are off limits is too vague. These cases often turn on evidence that the employee does not have the information to know who should not be contacted. For example, we recently dealt with an injunction prohibiting a party from contacting customers of the company that he was formerly affiliated with. *See SISU Energy, LLC*, 2020 WL 4006725, at *15–16. In *SISU*, the parties could not agree on who the company's customers actually were, and the enjoined parties were "left guessing" who they were prohibited from contacting. *Id.* at *16; *see also Heat Shrink Innovations, LLC v. Med. Extrusion Techs.-Tex., Inc.*, No. 02-12-00512-CV, 2014 WL 5307191, at *9 (Tex.

App.—Fort Worth Oct. 16, 2014, pet. denied) (mem. op.) (holding that injunction that vaguely named entities that could not be contacted was not "as definite, clear, and precise as possible").

But some courts of appeals go further and reject the proposition that an enjoined party's knowledge of which customers are off limits is a substitute for specificity in identifying those customers in an injunction order. *See Computek Comput. & Office Supplies, Inc. v. Walton*, 156 S.W.3d 217, 222–23 (Tex. App.—Dallas 2005, no pet.) (stating that even if the trial court had expressly found that appellant had information about which customers it should not contact because of its prior contacts with the customers, Rule 683 provides that "the order granting an injunction 'shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and *not by reference to the complaint or any other document*, the act or acts sought to be restrained'" and that "the injunction itself must provide the specific information as to the off-limits clients, without inferences or conclusions, or, in this case, implied references to other records [appellant] might have"); *see also McCaskill v. Nat'l Cir. Assembly*, No. 05-17-01289-CV, 2018 WL 3154616, at *4 (Tex. App.—Dallas June 28, 2018, no pet.) (mem. op.) ("As in *Computek*, the injunction itself does not provide the specific information about who the off-limits clients and customers are, and the lack of specificity cannot be cured by any knowledge [appellant] may have outside the injunction."); *In re Krueger*, No. 03-12-00838-CV, 2013 WL 2157765, at *9 (Tex. App.—Austin May 16, 2013, orig. proceeding) (mem. op.) (citing *Computek* as support for overturning contempt judgment

54

because the underlying "injunction does not identify the individuals who [Relator] is prohibited from contacting, and it requires [Relator] to make inferences or conclusions concerning whom those individuals are"). Further, at least one court of appeals that adopted a stricter view of the specificity required by an injunction order rejected the argument that the enjoined party can protect itself by asking if the customer is a client of the entity that is off limits. *See Computek*, 156 S.W.3d at 222. According to that court, the very asking of the question might be a violation of a restraint prohibiting solicitation. *See id.*

We do not have to resolve the question about whether an enjoined party's knowledge is sufficient to satisfy the specificity requirement of an injunction. Here, the record demonstrates that Individual Appellants were restrained from contacting customers with whom they had never dealt. Paragraph 19.c. of the injunction order covers not only policyholders that Individual Appellants dealt with but any policyholder within their sales territory. It also covers policyholders who bought a policy from Combined after Individual Appellants had left Combined. Individual Appellants both testified that they did not know who all of the Combined policyholders were in their Combined sales territories. Though Combined's representative testified that Individual Appellants might have known who the policyholders were in their territories before they left Combined, they could not have known who those policyholders were after they had left. Thus, the injunction order is not sufficiently specific because it does not identify the persons who cannot be contacted by Individual Appellants.

55

There is another failure in specificity that is latent in paragraph 19.c. of the injunction order. That paragraph restrains Individual Appellants from soliciting and inducing "any of Combined's policyholders within [Individual Appellants'] *sales territories.*" [Emphasis added.] Combined's employment agreements do not define Individual Appellants' sales territories other than "includ[ing] any territory or territories Employee was assigned to work in the twenty-four[-]month period immediately preceding the Termination of this Agreement." And there was disagreement at the injunction hearing as to what actually constituted Individual Appellants' sales territories. Individual Appellants testified that their sales territories were composed of certain counties in the respective states their territories touched but that their teams could make sales outside of these counties. Combined offered evidence that presumed that Individual Appellants' sales territories included any zip code in the state where one of the agents on their teams had sold a policy. Individual Appellants denied that Combined had ever provided such a list of zip codes to them. The injunction order does not state which view of the composition of the sales territories that the trial court had adopted. This is another failure of the injunction order to provide reasonable detail about what acts it prohibits. With the controversy about what constitutes Individual Appellants' sales territories unresolved by the terms of the injunction order, Individual Appellants do not know where they can and cannot solicit policyholders.

And there is a third failing that is in paragraphs 19.a. and b. of the injunction order. Those paragraphs restrain Individual Appellants from inducing or attempting to

induce "any of Combined's directors, officers, sales representatives, agents[,] or other employees who worked in Texas or Florida" from terminating their employment with Combined or to sell insurance competing with Combined's. Individual Appellants testified that they did not know or have contact with every single director, officer, sales representative, agent, or other employee that worked for Combined in Texas or Florida. Combined did not explain—either to the trial court or to this court—how Individual Appellants could have known this. Thus, the failure to identify the directors, officers, sales representatives, agents, or other employees that Individual Appellants could not induce or attempt to induce is another way that the injunction order fails to provide reasonable detail about the acts that it restrains.

The injunction order also fails to provide reasonable detail in a fourth regard as well. In paragraph 19.d., the injunction order prohibits the disclosure of confidential information and provides that the parties subject to the injunction are prohibited from "[d]ivulging, disclosing[,] or using Combined's confidential information as it is defined in the Combined standard employment agreement, including the identities, skills, talents, knowledge, experience, compensation, and preferences of any Combined Division 48 employees in Texas or Florida." This provision does not provide reasonable detail to describe the nature of the "skills, talents, knowledge, experience, compensation, and preferences" that the enjoined parties are prohibited from disclosing or using. The terms used are inherently vague because of their generality. As presently drafted, the injunction order does not state its terms with enough specificity to give

57

Individual Appellants adequate notice of the acts that they are restrained from doing. *See Ramirez v. Ignite Holdings, Ltd.*, No. 05-12-01024-CV, 2013 WL 4568365, at *4 (Tex. App.—Dallas Aug. 26, 2013, no pet.) (mem. op.) (holding that injunction order did not adequately define confidential information to give enjoined party notice of restrained acts and that enjoined party had to "infer whether any particular information or item in [his] possession constitute[d] 'proprietary information' or 'confidential information' subject to the injunction"); *see also Cooper Valves, LLC v. ValvTechs., Inc.*, 531 S.W.3d 254, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (holding that injunction that prohibited disclosure of "confidential and trade secret information" by referencing two-page list of information was "impermissibly vague, fail[ed] to provide adequate notice to appellants of the acts they are restrained from doing in terms not subject to reasonable disagreement, and therefore violate[d] Rule 683's specificity requirement").

We sustain Individual Appellants' first through third issues that challenge the failure of the injunction order to provide reasonable detail of the acts that it restrains.

## F.   The injunction order restrains Individual Appellants from performing several lawful activities.

In their fourth issue, Individual Appellants challenge the form of the injunction order because it allegedly prevents them from performing lawful activities. They cite the rule that "[a] trial court abuses its discretion by entering an 'overly-broad' injunction which grants 'more relief' than a plaintiff is entitled to by enjoining a defendant from conducting lawful activities or from exercising legal rights." The general principle that

58

Individual Appellants rely on is correctly cited. *See Harbor Perfusion, Inc. v. Floyd*, 45 S.W.3d 713, 718 (Tex. App.—Corpus Christi–Edinburg 2001, no pet.) ("[A] trial court abuses its discretion by entering an 'overly-broad' injunction which grants 'more relief' than a plaintiff is entitled to by enjoining a defendant from conducting lawful activities or from exercising legal rights." (quoting *Fairfield Estates L.P. v. Griffin*, 986 S.W.2d 719, 723 (Tex. App.—Eastland 1999, no pet.))). Here, the failings that Individual Appellants identify result from grammatical errors in the injunction order. Because we are remanding this case, the errors that we agree exist may be corrected on remand.

The challenge in Individual Appellants' fourth issue is predicated mostly on the failure of the restraints in the injunction order to follow the structure of the covenants. The injunction does contain various failings and ambiguities in this regard. The first failing that we address is an ambiguity found in paragraph 19.c. of the injunction order. Individual Appellants point out that the covenant's provision prohibiting the solicitation of policyholders is limited to policyholders in their respective sales territories. They challenge the injunction order's provision dealing with the policyholders because it uses only the phrase "within [their] sales territories" when restraining the inducement of policyholders to terminate their policies, but the phrase is not repeated to qualify the provision prohibiting the solicitation of the sale of competing insurance. Thus, they argue that the injunction prevents them from engaging in the lawful activity of soliciting the sale of competing insurance outside their former sales territories. As the provision is structured, the qualifying phrase might or

59

might not be read to apply to both prohibitions. Because we are remanding this case and have already held that the injunction is unduly vague, we instruct the trial court to clarify this provision to ensure that the limiting phrase clearly applies to both restraints in the provision.

The second challenge to the breadth of the injunction order is to paragraphs 19.a. and b. that prohibit the solicitation of Combined's employees to terminate their employment or to sell competing insurance. The challenge is that, as phrased, Individual Appellants are prohibited from engaging in acts of solicitation in both Texas and Florida, but the covenant in their Combined employment agreements prohibits solicitation only in the specific state where their respective sales territories were located, i.e., Texas for Hernandez and Florida for Azuero. Combined does not respond to this contention. We hold that the injunction order prohibits lawful activity because it fails to limit the geographic reach of its employee-solicitation and policyholder-solicitation provisions to the states in Individual Appellants' respective sales territories. This is another issue that the trial court should address on remand.

Finally, Individual Appellants challenge the provision prohibiting them from "[d]ivulging, disclosing, or using Combined's confidential information" because it potentially includes information that they obtained after leaving their employment with Combined. The injunction order, however, provides that the confidential information covered by the injunction is "as it is defined in the Combined standard employment agreement." That document appears to limit the reach of confidential information to

60

that acquired by the employee during the term of the agreement, which may be terminated at any time by the employee. Thus, the injunction does not contain the flaw that Individual Appellants claim that it has.

Thus, we sustain Individual Appellants' fourth issue in part by holding that the injunction order is overly broad because of failings in paragraphs 19.a.–c. described above. We overrule the remaining challenges raised in Individual Appellants' fourth issue.[8]

---

[8]In their fifth issue, Individual Appellants assert that the trial court exceeded its jurisdiction by granting more relief than Combined requested in "Plaintiff's First Amended Petition and Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction." *See RP & R, Inc. v. Territo*, 32 S.W.3d 396, 402 (Tex. App.—Houston [14th Dist.] 2000, no pet.) ("[W]here the injunctive relief granted exceeds the relief requested by the applicant in the petition, the trial court exceeds its jurisdiction."). The challenge takes two forms.

The first challenge is that Combined's application sought only to prevent the disclosure of confidential information that Hernandez but not Azuero had obtained while affiliated with Combined and that the injunction covers disclosure by Azuero as well. The application did not allege a breach-of-contract claim against Azuero, but it did allege a tortious-interference claim and a conspiracy claim against him. Thus, as phrased, the application could have been read as seeking to restrain Azuero from disclosing information that Hernandez had acquired. Though the injunction did not parse the matter to describe the source of the information that Azuero is prohibited from disclosing, there was a basis for the trial court to enjoin Azuero from disclosing information even though he may not have been the person that acquired the information. For this reason, the injunction did not necessarily grant relief that was not supported by the application.

The second challenge is that the application sought to prohibit Individual Appellants from inducing or attempting to induce Combined's "directors, officers, sales representatives, agents[,] or other employees" who worked in their sales territories from terminating employment or from selling competing insurance. The complaint is that the injunction is broader and covers directors, officers, sales representatives, agents, or

**G.     The trial court abused its discretion by enjoining Family Heritage.**

In its first issue, Family Heritage argues that the trial court abused its discretion by entering an injunction order that restrained its actions.  Family Heritage argues that if the trial court found that Family Heritage had interfered with Combined's employment agreements with Individual Appellants, that finding is unsupported by the record.  Combined makes only an oblique response to this argument.  Instead, Combined mostly relies on a theory of agency to warrant relief against Family Heritage.  To support this argument, Combined asserts that, although Individual Appellants' contracts with Family Heritage describe them as independent contractors, Family Heritage exercised a degree of control over them that they were in fact agents, and thus, Family Heritage is vicariously liable.  We agree that the record does not support the existence of a tortious-interference claim against Family Heritage, we reject Combined's argument that challenges the independent-contractor status of Individual Appellants,

---

other employees "who worked in Texas or Florida."  This disconnect exists.  But we are remanding this case to the trial court to address the vagueness of the injunction.  We assume that the application will be amended on remand to deal with the other matters addressed in this opinion, and therefore, we do not reach the question regarding whether the present state of the application supports the relief contained in the injunction.

and we hold that the trial court abused its discretion by entering an injunction order that restrained Family Heritage's actions.

### 1. The injunction order is ambiguous regarding the cause of action forming the basis for relief.

Combined sued Family Heritage for tortious interference, conspiracy, a constructive trust, and an accounting. Other than mentioning a conspiracy claim in its statement of the case, Combined's brief never again mentions that cause of action. The finding in the injunction order that mentions the basis for relief against Family Heritage provides little guidance as to what cause of action it is referencing:

> Reineldo Urgelles, Larry Salerno, Miguel Cruz, Dynasty Financial Group, and Family Heritage benefitted and will continue to financially benefit from [Individual Appellants'] solicitation of Combined's agents and breach of the agents' non[]solicitation restrictions as each of these persons receives a certain amount of commission on policies sold by the agents that [Individual Appellants] recruited from Combined. As such, these parties acted "in concert" with [Individual Appellants] to solicit Combined's agents in Texas.

### 2. The trial court abused its discretion to the extent that it found that the evidence supported a tortious-interference claim against Family Heritage.

First, we agree with Family Heritage that the record does not contain evidence of tortious interference. The record lacks evidence that Family Heritage intentionally interfered with Individual Appellants' employment agreements.

To begin this analysis, we must sort out what interference claim Combined alleged. Its amended petition alleges a claim that "Family Heritage knew of Combined's contractual and advantageous business relationships between Combined and its

employees" and knew of Combined's contention that Individual Appellants violated their employment agreements. But Individual Appellants were at-will employees of Combined. To the extent that Combined is claiming that Family Heritage interfered with Combined's relations with the two by inducing them to quit Combined, that is not a cognizable claim. *Lazer Spot, Inc. v. Hiring Partners, Inc.*, 387 S.W.3d 40, 53 (Tex. App.—Texarkana 2012, pet. denied) (holding mere hiring of another's at-will employee legally insufficient to prove tortious interference). The only other contractual relationships that Combined's petition mentions are Individual Appellants' employment agreements with Combined.[9] And, in a pleading filed in the trial court, Combined characterizes its claim as inducing Individual Appellants to violate the nonsolicitation provisions of those contracts. Thus, we will focus on the question of whether there is evidence that Family Heritage interfered with the nonsolicitation covenants in the employment agreements.

"The elements of tortious interference with an existing contract are[] (1) the existence of a contract subject to interference[,] (2) the occurrence of an act of

---

[9]Specifically, Combined's amended petition states that

Family Heritage knew of Combined's contractual and advantageous business relationships between Combined and its employees in that Combined informed Family Heritage of [Individual Appellants'] post-employment violations under their Employment Agreements[] and also provided a copy of the Employment Agreements. In addition, [Individual Appellants] were required to provide a copy of their Employment Agreements to Family Heritage at the commencement of their employment with Family Heritage, in accordance with ¶19(d).

interference that was willful and intentional[,] (3) the act was a proximate cause of the plaintiff's damage[,] and (4) actual damage or loss occurred." *Duradril, L.L.C. v. Dynomax Drilling Tools, Inc.*, 516 S.W.3d 147, 167 (Tex. App.—Houston [14th Dist.] 2017, no pet.). "[T]o establish the element of a willful and intentional act of interference, the plaintiff must produce evidence that the defendant was a more-than-willing participant and knowingly induced one of the contracting parties to breach its obligations under the contract." *Id.* at 168; *Funes v. Villatoro*, 352 S.W.3d 200, 213 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (same); *see also, e.g.*, *Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 927 (Tex. 1993) (holding that appellant's conduct did not involve knowing inducement as required to establish tortious interference); *John Paul Mitchell Sys. v. Randalls Food Mkts., Inc.*, 17 S.W.3d 721, 730–31 (Tex. App.—Austin 2000, pet. denied) (stating that it is necessary that there be some act of interference or of persuading a party to breach in order for tort liability to arise; merely participating in a transaction does not constitute the knowing inducement required to impose liability for tortious interference); *Davis v. HydPro, Inc.*, 839 S.W.2d 137, 140 (Tex. App.—Eastland 1992, writ denied) (stating that plaintiff must show that defendant knowingly induced breach; it is not sufficient that defendant reaped the advantages of a broken contract); *Texaco, Inc. v. Pennzoil Co.*, 729 S.W.2d 768, 803 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.) (stating that plaintiff must show that defendant took an active part in persuading party to breach contract); *Arabesque Studios, Inc. v. Acad. of Fine Arts, Int'l, Inc.*, 529 S.W.2d 564, 568 (Tex. App.—Dallas 1975, no writ) (stating that it is incumbent

upon plaintiff to demonstrate that defendant actually caused or brought about interference).

Family Heritage characterizes Combined's basis for its tortious-interference claim as being that Family Heritage knew that Individual Appellants were breaching their contractual obligations with Combined and took no action to stop them. Combined seems to accept this characterization by arguing that Family Heritage ratified the acts of Individual Appellants as its agents when it retained the benefits of their actions after acquiring full knowledge of what they had done. We will address shortly why the record supports Family Heritage's contention that Individual Appellants were only independent contractors, for whose actions Family Heritage was not responsible. But, to the extent that Combined's argument is a backdoor effort to argue that Family Heritage tortiously interfered with Individual Appellants' employment agreements, it fails; the fact that Family Heritage benefitted from a breach of Individual Appellants' employment agreements with Combined is not sufficient to establish that it knowingly induced Individual Appellants to breach those agreements.

Family Heritage's representative testified that Family Heritage was unaware of the February 18 meeting until it received a copy of a cease-and-desist letter from Combined to Hernandez in early March. The first time that Family Heritage became aware of Individual Appellants' employment agreements was when it received the cease-and-desist letter. When Family Heritage received the cease-and-desist letter, it investigated the February 18 meeting and found no evidence of solicitation or the

possession of confidential information. After the investigation, Family Heritage did not terminate its affiliation with Individual Appellants. But, after receipt of the cease-and-desist letter, Family Heritage stopped appointing former Combined agents as its representatives, effectively putting a hold on new affiliations with Individual Appellants' former Combined team members. Later, Family Heritage's representative testified that the halt only occurred because the trial court entered a temporary restraining order.

In essence, Combined argues that the evidence establishes that Family Heritage should have known what Individual Appellants were doing and should have moved to stop them or terminated their appointments. Family Heritage did not do so and allegedly benefitted from Individual Appellants' actions. To the extent that argument is made to support the claim of tortious interference, it fails. Placing Family Heritage in the status of a beneficiary of the breach is not evidence of the necessary element that Family Heritage knowingly induced a breach of Individual Appellants' Combined employment agreements. Thus, an injunction restraining Family Heritage cannot be predicated on Combined's tortious-interference claim.

3. **The trial court abused its discretion to the extent that it found that the evidence supported a conspiracy claim against Family Heritage.**

Combined's conspiracy claim relies on the existence of an underlying tortious-interference claim to support the conspiracy. Because there is no viable tortious-interference claim, Combined's conspiracy claim fails as well. *See Nguyen*, 2020 WL 2071757, at *9 ("Further, because conspiracy and aiding and abetting claims depend on

67

the commission of an underlying tort, the aiding and abetting and conspiracy claims against E2 and Southwest, to the extent they are based on Nguyen's tortious interference with his own agreements, must also be dismissed.").

### 4. The trial court abused its discretion to the extent that it found that Individual Appellants were agents of Family Heritage and that Family Heritage was vicariously liable for their acts.

As noted, Combined primarily argues that it has a claim against Family Heritage by asserting that Individual Appellants were Family Heritage's agents and that Family Heritage is vicariously liable for their acts. Combined makes this argument even though the marketing agreement that Individual Appellants had signed with Family Heritage designates them as independent contractors and all Appellants testified that Family Heritage did not control Individual Appellants' business operations. In the face of this evidence, Combined's only bases to contend that Individual Appellants were agents are a smattering of provisions of the marketing agreement that governed the relationship between Family Heritage and Individual Appellants. These provisions do not create the agency relationship that Combined contends.

When Individual Appellants became affiliated with Family Heritage, they both executed a marketing agreement. That agreement unambiguously characterized Individual Appellants as independent contractors and enunciated many of the responsibilities, benefits, and detriments that accompany that status:

> [t]he REPRESENTATIVE, in carrying out the terms of this Agreement, will not be obliged to work under the supervision or control of FAMILY HERITAGE and will act as an independent contractor of FAMILY

68

HERITAGE. It is understood and agreed that nothing in this Agreement, or otherwise, creates or shall be construed to create the relationship of principal and agent, master and servant, or employer and employee between FAMILY HERITAGE and the REPRESENTATIVE. It is understood that FAMILY HERITAGE does not direct the REPRESENTATIVE as to the time and place of the solicitation of insurance applications. The REPRESENTATIVE is also treated as an independent contractor for purposes of unemployment compensation, worker[s'] compensation, income tax withholding[,] and social security. To aid the REPRESENTATIVE in complying with state and federal tax requirements, FAMILY HERITAGE will provide the REPRESENTATIVE with a copy of Form 1099. The REPRESENTATIVE will be responsible for all self-employment taxes (S.E.C.A.) on the REPRESENTATIVE commissions.

Further, Family Heritage's representative and Individual Appellants all testified that Individual Appellants were independent contractors who (1) were not required to take specific training from or to submit any particular reports to Family Heritage; (2) received Form 1099s based on their commissions; (3) received no general travel reimbursement or retirement benefits, insurance, or vacation benefits from Family Heritage; (4) set their own work hours; (5) provided their own office space and equipment; (6) received no instruction on how to sell Family Heritage products; and (7) were placed in no particular sales territory by Family Heritage. Family Heritage's representative and Individual Appellants also testified that Family Heritage did not direct Individual Appellants on how to recruit others to join their teams.

It is axiomatic that a person who retains a true independent contractor is not liable for the contractor's torts. *See Farlow v. Harris Methodist Fort Worth Hosp.*, 284 S.W.3d 903, 911–12 (Tex. App.—Fort Worth 2009, pet. denied). The distinction

between an employer–employee relationship and that of an independent contractor turns on who has the right to control the details of the work done by the contractor. *Id.* "An independent contractor is one who, in pursuit of an independent business, undertakes specific work for another using his or her own means and methods without submitting to the control of the other person as to the details of the work." *Id.* at 911.

When a contract controls the relationship between the parties, that contract usually controls the nature of the relationship. But the label of "independent contractor" used in a contract can be undermined by the terms of the contract itself or how the parties operate under it. As our court has explained,

> A contract expressly providing that a person is an independent contractor is determinative of the relationship absent evidence that the contract is a mere sham or subterfuge designed to conceal the true legal status of the parties or that the contract has been modified by a subsequent agreement between the parties. Evidence that the parties did not intend for an independent[-]contractor relationship can come from the contract itself, i.e., whether, despite language describing the relationship as an independent[-]contractor relationship, other contract language evidences such a right of control that the relationship is actually that of employer[–]employee. It can also come from extrinsic evidence, such as instances of actual control by the principal sufficient to show that the true agreement of the parties vested a right of control establishing an employment relationship. In such cases, the exercise of control is evidentiary only and "must be so persistent and the acquiescence therein so pronounced as to raise an inference that at the time of the act or omission giving rise to liability, the parties by implied consent and acquiescence had agreed that the principal might have the right to control the details of the work."

*Id.* (citations omitted). In addition to showing an employer–employee relationship, a party wishing to impose vicarious liability on the person allegedly controlling the work

70

must show that "the right to control [] extend[s] to the specific activity from which the injury arose." *Id.* at 912.

Federal caselaw—particularly caselaw addressing Title VII claims[10]—often analyzes an insurance representative's status as an employee or an independent contractor and is thus helpful in this context.[11] Federal courts have looked to the following factors in determining whether an insurance representative functions as an independent contractor: (1) is the person an insurance professional; (2) did the person sign an agency agreement that expressly identified the person as an independent contractor; (3) did the insurance company supervise the person's day-to-day activities; (4) did the person work out of an independent office, hire assistants, and pay all office-related expenses, including assistant's salaries, rent, utilities, furniture, and supplies; (5) is the person subject to any formal hour or leave policies; (6) is the person paid exclusively by commission and responsible for paying self-employment taxes and not entitled to employee benefits; and (7) is the person free to terminate his or her contract at will. *See*

---

[10]Title VII of the Civil Rights Act of 1964 addresses employment discrimination claims. *Quantem Chem. Corp. v. Toennies*, 47 S.W.3d 473, 478 (Tex. 2001). Title VII protects employees, not independent contractors. *Johnson v. Scott Fetzer Co.*, 124 S.W.3d 257, 263 (Tex. App.—Fort Worth 2003, pet. denied). Thus, cases involving Title VII provide tests such as the hybrid economic realities/common law control test, which we discuss below, and give us guidance on how to distinguish between an employee and an independent contractor. *Id.*

[11]"Although we are not bound by federal authority, we may rely on it as persuasive." *City of Carrollton v. Singer*, 232 S.W.3d 790, 797 n.6 (Tex. App.—Fort Worth 2007, pet. denied).

*Wortham v. Am. Fam. Ins. Grp.*, 385 F.3d 1139, 1140–41 (8th Cir. 2004) (utilizing test to

determine if person were employee for purposes of age discrimination complaint under

Title VII, among other federal statutes).

Family Heritage suggests that we use the "hybrid economic realities/common

law control test" that the Fifth Circuit uses to decide whether an insurance

representative is an independent contractor for purposes of Title VII claims. *See Craft-*

*Palmer v. State Farm Ins. Co.*, No. 98-60008, 1998 WL 612388, at *1 (5th Cir. Aug. 27,

1998) (not designated for publication). To make that determination, the Fifth Circuit

used factors similar to those outlined in the preceding paragraph to determine that a

representative was not an employee and held that

> [u]nder [appellant's] contract with [appellee], she is repeatedly designated
> as an independent contractor rather than an employee. [Appellee]
> controls no details of the manner or means in which she executes her
> business, runs her office, determines her work schedule or clients, or hires
> or fires employees. The fact that [Appellee] furnishes insurance forms,
> provides life insurance and major medical insurance, can accept or reject
> a prospective policy[]holder, and required her to be an exclusive agent are
> minor matters and not determin[a]tive. Other courts have uniformly held,
> in circumstances less compelling than those before us, that independent
> insurance agents are not as a matter of law "employees" for Title VII
> purposes.

*Id.*

Combined does not challenge the application of the Fifth Circuit's hybrid test

that Family Heritage offers to gauge whether Individual Appellants were independent

contractors, and Combined does not offer a test of its own. The evidence that we have

outlined of the relationship between Individual Appellants and Family Heritage tracks

the factors that the cited federal cases have relied on to conclude that a representative is an independent contractor in an insurance sales context. Individual Appellants (1) were insurance professionals; (2) signed agreements with Family Heritage that expressly identified them as independent contractors; (3) performed day-to-day activities without supervision from Family Heritage; (4) worked out of their own independent offices, set their own hours, and paid their own expenses; (5) were not subject to any formal vacation or leave policies; (6) were paid exclusively by commission, were responsible for paying their own self-employment taxes, and were not entitled to employee benefits; and (7) were free to terminate their contracts with Family Heritage at will. Thus, the evidence indicates that Individual Appellants are independent contractors.

Combined's only challenge to the status of Individual Appellants as independent contractors highlights a few provisions of their marketing agreements. With little explanation, Combined relies on these few provisions to argue that a fact issue exists regarding whether Individual Appellants were indeed independent contractors. The entirety of Combined's argument is that

> Family Heritage's control over its agents extends to forbidding them from selling *any* products other than Family Heritage products. Agents who violate this rule may be stripped of their commissions. Violating this rule is also grounds for termination. Hence, on pain of termination, Family Heritage agents are allowed to sell only Family Heritage supplemental health and life insurance policies[] and nothing else.

73

Family Heritage requires its agents to sign a "Marketing Agreement" that contains a confidentiality clause, covenant not to compete[,] and covenant not to solicit Family Heritage agents.

Family Heritage requires its agents, in interacting with prospective policyholders, to "strictly" comply with "the written and printed instructions of Family Heritage."

Family Heritage has authority to reject any application produced by an agent without specifying a reason.

Finally, while Family Heritage agents are expected to recruit others to be agents for Family Heritage, the recruits may not sell Family Heritage policies until they are approved by Family Heritage. [Record references omitted.]

Taking each argument in turn, Combined's first contention turns on the argument that a representative who is a captive—in that he or she cannot sell insurance for anyone other than Family Heritage—creates a fact question regarding whether the person is actually an independent contractor. However, one federal court has explained that captive status does not make a representative an employee because "[d]espite the constraints imposed on Plaintiffs' ability to sell insurance for competing companies, their compensation from Defendant depends entirely on their sales." *Desimone v. Allstate Ins. Co.*, Nos. C 96-03606 CW, C 99-02074 CW, 2000 WL 1811385, at *14 (N.D. Cal. Nov. 7, 2000) (order denying plaintiffs' motion and granting defendant's cross-motion for summary judgment on certain causes of action). Thus, Combined's assumption that Individual Appellants' status as captive agents prevents them from independent-contractor status is incorrect.

74

Combined cites no authority or explanation for its second argument that the presence of noncompete, nonsolicitation, and confidentiality provisions turn an independent contractor into an employee. Courts frequently see noncompete, nonsolicitation, and confidentiality clauses contained in contracts with independent contractors; this is not uncommon and does not alter an individual's status as an independent contractor. *See RigUp, Inc. v. Sierra Hamilton, LLC*, 613 S.W.3d 177, 185 (Tex. App.—Austin 2020, no pet.); *Cobb v. Caye Publ'g Grp., Inc.*, 322 S.W.3d 780, 782 (Tex. App.—Fort Worth 2010, no pet.).

Combined's third argument—that a representative must comply with Family Heritage's instructions—apparently refers to a provision in the marketing agreement that states that

> [t]he REPRESENTATIVE and any person representing or employed by him shall make regarding insurance no representation of fact which is not strictly consistent with the written and printed instructions of FAMILY HERITAGE, and shall not pretend in any manner whatsoever to change or waive the terms of any instruction or policy contract issued by FAMILY HERITAGE.

The fact that Family Heritage does not want its product misrepresented to a policyholder is hardly the level of control creating an employer–employee relationship.

Nor is the fact that Family Heritage must decide whether it will accept an application. Again, Combined does not explain how the fact that Family Heritage decides whether to issue a policy constitutes control in how the representative markets a policy or hires the agents who work for the independent contractor.

75

Finally, Combined claims that Family Heritage has control because Family Heritage approves the nomination of a new agent when the new agent is nominated by an existing agent. This argument ignores the nature of the approval process, which Family Heritage's representative described as "[o]nce you're appointed by the state and have a license from the Department of Insurance, you know, and they meet our criteria in terms of [a] background check, you know, yes." Again, the fact that Family Heritage wants to ensure that a representative is legally licensed to sell its product and is of appropriate character does not manifest a level of control over the discretion of the representative in the details of recruiting his or her sales force.

Moreover, Combined's arguments have a more basic failing. As we noted, for vicarious liability to arise in the context of an independent contractor, "the right to control must extend to the specific activity from which the injury arose." *See Farlow*, 284 S.W.3d at 911–12. Combined does not explain how the various aspects of "control" that it mentions raise a material fact issue that Family Heritage controlled how its affiliated representatives selected representatives for their sales teams. The only argument that comes close to showing control is the process of determining whether an agent nominated by another agent is licensed and passes a background check. That is not a level of control that supports a finding that Family Heritage controlled the independent contractor's decision to appoint agents who might have worked for a competing company.

76

The management agreement that Individual Appellants entered into with Family Heritage categorizes them as independent contractors. The testimony shows that they operated their businesses as independent contractors. None of the contentions that Combined raises move us to sustain its argument that there was a fact issue on the question of whether Individual Appellants' representatives were employees or agents rather than independent contractors.

We sustain Family Heritage's first issue and hold that the trial court abused its discretion by enjoining Family Heritage. With this resolution of Family Heritage's first issue, we need not address Family Heritage's second issue that attacks the form of the injunction order. *See* Tex. R. App. P. 47.1.

## V. Conclusion and Relief Granted

Having sustained Family Heritage's first issue, we vacate the portion of the injunction order that restrains Family Heritage and dissolve the temporary injunction as to Family Heritage.

With regard to Individual Appellants' issues, the trial court did not abuse its discretion by finding that the covenants at issue are reasonable and that Combined demonstrated a probable right to relief. The trial court did not abuse its discretion by finding that Individual Appellants induced or solicited Combined's policyholders and employees. Finally, the trial court did not abuse its discretion by finding that Combined would probably suffer an imminent and irreparable injury. Thus, having overruled

Individual Appellants' sixth, seventh, eighth, and ninth issues, we affirm these aspects of the trial court's findings and injunction order.

But having mostly sustained Individual Appellants' first, third, and fourth issues that challenge the form of the injunction order, we reverse and remand the trial court's injunction order only as to form. And, because we are remanding, we leave the resolution of Individual Appellants' fifth issue to be dealt with on remand by the trial court.

Though we have the discretion to modify an injunction that is overly broad or vague, we lack the information necessary to do so in this case. *Compare Bellefeuille*, 2016 WL 1163364, at *8 ("We have the discretion to modify an injunction that is overly broad or vague, if possible."), *with Cooper Valves, LLC*, 531 S.W.3d at 267 (remanding case to trial court when appellate court concluded that plaintiff had shown probable right to relief but form of injunction violated Rule 683 because it was vague and overbroad). Therefore, with respect to paragraphs 19.a., b., c., and d. of the portion of the injunction order that restrains Individual Appellants, we remand this case to the trial court for further proceedings consistent with this opinion.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: February 11, 2021